IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DEFFENBAUGH INDUSTRIES, INC.,

                    *Plaintiff*,


            vs.                                    Case No. 20-2204-EFM


THE UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/KANSAS CITY,
KANSAS,

                    *Defendant*.


## MEMORANDUM AND ORDER


Plaintiff Deffenbaugh Industries and Defendant Unified Government (UG) of Wyandotte County/Kansas City, Kansas entered into a Contract for Deffenbaugh to provide trash collection services for Wyandotte County residents.  Beginning in May 2019, the UG began to deduct from Deffenbaugh's monthly invoices substantial penalties, pursuant to Section 7.02(b) of the Contract, for missed pickups.  Deffenbaugh eventually notified the UG it was terminating the Contract in February 2020, stating that the UG had defaulted by, among other things, imposing excessive penalties.  The following month, Deffenbaugh brought the present action under the Declaratory

Judgment Act,[1] along with a claim for breach of contract.  The UG has counterclaimed, seeking declaratory relief, an injunction to prevent Deffenbaugh from terminating the Contract while the action is pending, and damages for Deffenbaugh's alleged breaches of the Contract.

The parties have filed cross-motions for summary judgment. Deffenbaugh seeks declarations that the Contract was validly terminated as of March 22, 2020 (Count 1), and that the penalty clause in Section 7.02 of the Contract is unenforceable (Count 2).  It also argues that the UG breached the contract (Count 3).[2] The UG seeks a determination that it is not in default under the Contract, which remains in effect, and that it is entitled to recover damages for Deffenbaugh's various breaches of the Contract.[3]

## I.      Factual and Procedural Background

### A.      The Contract

On January 27, 1993, the City of Kansas City, Kansas entered into a contact with Deffenbaugh providing for city-wide collection and disposal of residential solid waste for a twenty-year period expiring on June 30, 2013.

---

[1] 28 U.S.C. §§ 2201, 2202.

[2] Pretrial Order (Dkt.  92), at 43-44.

[3] *Id*. at 50-53.

On January 1, 2012, the UG and Deffenbaugh entered into another waste contract.  Deffenbaugh was represented in the negotiations by attorney Pete Heaven of Lathrop & Gage.  The agreement was intended to "provide Customers with service of the highest possible quality," and Deffenbaugh agreed to "employ an adequate number of employees to efficiently and properly perform the services contemplated by this Contract," and to make collections "between the hours of 7:00 a.m.  and 5:00 p.m. Monday through Friday."[4]

Deffenbaugh agreed that it would provide collection services "for Waste which is placed Curbside by 7:00 a.m."[5]  In practice, Deffenbaugh picked up trash from a residence if the trash was placed at the curb before its truck came by.[6] Deffenbaugh

---

[4] Contract, at Sections 6.01, 4.03, and 5.01 (respectively).

[5] Section 5.01.  Section 1.10 of the Contract defines "Curbside" as "[t]he placing of Waste at the curb or edge of the roadside for collection."

[6] Section 1.15 of the Contract defines "Waste" as:

> All garbage, rubbish, trash, refuse or waste generated at a Residential Unit or at a UG Facility.  Specifically, Waste is: (a) animal or vegetable leavings or similar food or food refuse, paper products, tin cans, cardboard, wood, paper, ferrous and nonferrous metals, plastics or other household refuse; (b) household junk or refuse, including ashes, magazines and newspapers, lawn or small tree trimmings and leaves, shrubbery, household building materials and other similar items, and (c) bulk items including large household furniture and appliances such as mattresses, chairs, refrigerators and stoves, and tree trimmings; and (d) household hazardous waste in de minimis quantities as is commonly found in the refuse of households; (c) automotive tires not to exceed two (2) per month per residential unit.

> The following items shall not be disposed of by Contractor and shall not be considered Waste for purposes of this Contract: (a) plaster, rubble, wood, and all debris from demolition and rehabilitation of 5 building structures, (b) automotive parts improperly bundled, (c) waste from any public school or commercial or industrial establishment, (d) regulated hazardous waste, (e) polychlorinated biphenyl waste, (f) regulated non-containerized liquid waste, (g) medical waste, or (h) dead animals.

could refuse to pick up Waste which was "not secured contained or packaged in Containers, Bags or Bundles, other than bulk items which cannot be so packaged."  If Deffenbaugh refused to pick up waste as noncompliant, it agreed under Section 5.04(c) to notify the customer by placing "a red tag [on] the uncollectible Waste" and providing a copy to the UG.

Section 2.06 of the Contract provided that Deffenbaugh would be paid $9.67 per Residential Unit per month for 2012 and 2013, and the amount would increase to $11.23 for 2014.  Deffenbaugh was to "invoice the UG for one twelfth the annual fee for services performed on a monthly basis" and "[t]he UG shall have thirty (30) calendar days from the date of receipt of the invoice to approve the invoice and make payment."

**B.     The Penalty Clause**

Section 7.02 established procedures for Deffenbaugh to process Customer complaints.  The key dispute in the present action is Subsection (b), which provides a stipulated charge of $200 per residence, if a complaint of a missed collection is not remedied within 24 hours.  Entitled "Complaints," this section provides:

> (a) The Contractor shall be responsible for receiving Customer's inquiries, requests for service and complaints related to service under this Contract. The Contractor shall provide the UG with a telephone number which will be published in informational literature and in the Government section of the local telephone book.  Any calls received by the UG concerning the services provided under this Contract shall be referred to this number.

4

The Contractor's telecommunications system must be capable of handling Customer calls during peak periods of activity.

(b) The Contractor shall make and retain a record of each complaint received, including the name, address and telephone number of the complainant, date and time of the complaint, date and nature of the occurrence complained of and disposition of the complaint.  Upon receipt of a complaint, the Contractor shall promptly investigate.  All complaints shall be resolved expeditiously within the 24 hour period following receipt.  If the complaint involves a failure by the Contractor to make a scheduled collection, and if the Contractor fails to make such collection within 24 hours after receipt of the Complaint, Contractor shall be penalized two hundred dollars ($200.00) for each 24 hour period in which such failure continues, which amount shall be deducted from the UG's next payment to the Contractor.  The Contractor may appeal this penalty to the County Administrator whose decision on the matter will be final.

(c) The Contractor shall upon within 2 business days of such request forward to the Contracting Officer a description of each complaint received by the Contractor and a description of the disposition of the Complaint.
.

For purposes of the Contract, a "Customer" is "[a]n occupant of a Residential Unit," which is defined as "[a] dwelling ...  forming a single inhabitable unit with facilities used or intended to be used for living, sleeping, cooking and eating."

The 1993 contact contained a penalty provision which is identical, except that the penalty was $100 per day.

The UG's representative Mike Tobin testified in his Rule 30(b)(6) deposition that the purpose of the clause in the 1993 Contract was "just to ensure performance.."  The penalty amount was recommended by one of the UG's outside attorneys, William

Brashares, who has stated he thought the charge was reasonable and was customary in the industry.

The UG is not aware of any analysis of the penalty provision in Section 7.02(b) before the 1993 Contract was signed, or how the penalty amount was determined. The UG has not identified anyone and is unaware of anyone who, prior to execution of the Contract, participated in any analyses, studies, examinations, investigations, or evaluations of the penalty provision in Section 7.02(b) of the Contract. There were no discussions in which specific reasons were offered for the penalty chosen (whether $100 or $200). In particular, there was no analysis, consideration, evaluations, or studies comparing the $200 per residence penalty imposed under Section 7.02(b) to the amount per residence that the Deffenbaugh was paid for collections services.

The UG argues that Deffenbaugh internally referred to Section 7.02(b) as a "liquidated damages," but this substantially overstates the evidence. The UG cites to two emails, by Deffenbaugh officers, both of which document what Mayor Holland of the UG said in a private conversation. It was during that conversation, in which the mayor complained the trash service issue "damaged his political image," and stated he "has a LIQ invoice for $200K, not yet sent." The context of the emails clearly indicates that the liquidated damages terminology originated with the mayor. The UG cites no evidence that, at any other time, Deffenbaugh staff considered the Section 7.02(b) penalties as liquidated damages.

In its own internal invoices calculating the deductions to be made from its payments to the collector, the UG consistently used the term "penalty" and not liquidated damages.[7]

The Contract does contain a provision (Section 3.07(a)) which expressly provides for liquidated damages.

> If the UG should reasonably determine at any time that the Contractor's performance hereunder is inadequate due to a lack of proper equipment, the Contracting Officer may issue a written order requiring the Contractor to utilize additional vehicles or other equipment…. If the Contractor fails to comply with such determination within sixty (60) days of the date thereof, such failure shall constitute a breach of this Contract, and the Contractor shall forfeit as liquidated damages the sum of one thousand dollars ($1000) per item of equipment for each day that such failure continues.

The UG has not asserted a claim for liquidated damages under Section 3.07 of the Contract.

## C.     Early Performance

When trash is not collected and left overnight it may create a public health issue, animals such as dogs, varmints, racoons or other wildlife can get into it, or bags can deteriorate exposing trash to the environment.   Further, the spillage of trash in a neighborhood affects the cleanliness, health and aesthetics of the neighborhood.   At the

---

[7] *See, e.g.* Dkt.  100-8 ("Waste Management May 2019 Penalty $227,400.00").

same time, the contract allows Deffenbaugh to refuse to collect some trash which is not compliant with pick up regulations.

UG employee Ken Mack testified that, in his over 20 years of experience, for a single missed collection, 99% of the time the Customer failed to place Waste or recycling Curbside prior to 7:00 a.m. "Because oftentimes, you know it's a late setout when the whole street is picked up and you only got one trash sitting out there.  99 percent of the time you know it's a late setout."

In September 2014, Waste Management Holdings, Inc. entered into an "Agreement and Plan of Merger" pursuant to which it would acquire Deffenbaugh Industries, Inc.  That transaction closed in or about April 2015, after which Deffenbaugh began doing business as "Waste Management."

According to Paul Howe of Waste Management, the number of reported missed collections increased significantly after Waste Management acquired Deffenbaugh.  But the proportional share of missed collections remained small.  In May 2019, Deffenbaugh had 450,000 scheduled collections, yet the UG's 311 telephone system (which allows citizens to call and report non-emergency issues) only received 364 complaints about missed trash collections.

By as early as June 2016, Deffenbaugh was aware that the UG was considering enforcing its remedy under Section 7.02(b).  On November 23, 2016, Deffenbaugh's Area Vice President, Michael Watson, emailed to UG that the company's service would improve.

8

On June 30, 2017, the UG issued a letter to Deffenbaugh stating that it would be deducting $67,703.67 from the UG's next payment pursuant to Section 7.02(b) of the Contract, after Deffenbaugh failed to timely resolve the miss of an entire neighborhood.

At the time, Deffenbaugh did not protest that Section 7.02(b) was unenforceable, but agreed to the fine. The UG and Deffenbaugh negotiated alternative remedies outside of the 2012 Contract that would benefit both parties, including Deffenbaugh contributing to a welcome sign placed off a local interstate, but the parties did not reach an exact agreement.

In a July 7, 2017 internal Deffenbaugh email, Kent Harrell asked "Wondering why it is so hard for us to pick up the garbage in KC?" One Deffenbaugh manager acknowledged that the company had a continuing problem with "Code Reds"— unresolved residential complaints. Howe has agreed that in May 2018, Deffenbaugh was not performing under the Contract requirements. In a May 16, 2018 internal email, Justin Vetsch wrote "[i]t is disappointing that we have been this poor of a provider." In a June 12, 2018 internal Deffenbaugh email, Vetsch stated that Deffenbaugh needed more trucks to better support the city: "more trucks are needed."

Beginning on May 23, 2018 and lasting through August 15, 2019, Deffenbaugh sent a daily email to the UG reporting the approximate number of homes remaining on any routes that were not completed that day, and reporting the completion time. For that period, it reported that it failed to complete collections by 5:00 p.m. on over 300

days, failed to complete trash or recycling routes on over 130 day, and failed to complete routes on at least 100 days.

By the summer of 2018, the UG was sending a report of trash complaints entered in the UG's 311 system to Deffenbaugh on a daily basis.  Often, the 311 reports included reports the Plaintiff missed entire neighborhoods, entire blocks, entire streets, and one side of a street.  In a June 20, 2018 internal email, Vetsch stated he was "concerned" the 311 "list keeps growing."  He described the Plaintiff's performance in internal emails as: "Awful!"; "Terrible"; and "Pitiful."  On July 3, 2018, he wrote that "KCK trash failures are on fire to def con 10."

Deffenbaugh does not contend that its performance during this period was good.  It notes, however, that during the ten-month period of May 2019 to February 2020, the time during which the UG contends Deffenbaugh's performance was at its worst, the UG imposed a penalty for 1,226 Residents.  During this time there were over 450,000 scheduled collections each month in the UG.  Thus, the UG imposed a penalty for missed pick-ups for 0.27% of the scheduled collections.


**D.    The 311 Dispute**

By at least May 2018, the parties were in discussions to allow the company direct access to the UG's "311" system.  In receiving customer calls, Deffenbaugh would continue to "action and respond" to each service call the company received directly, but would ask the complaining party to "please use 311 in the future."  According to the

minutes of a May 16, 2018 meeting between the parties the goal was to centralize complaints through the UG's 311 system.

By the understanding and agreement of the parties, the UG's 311 number served as the collector's number under Section 7.02(a) of the contract. On or about July 31, 2018, Deffenbaugh was provided two logins and passwords for the UG's 311 system.

In a June 12, 2018 internal Deffenbaugh email, John Blessing stated the "end goal is to use this to better communicate and resolve service issues for a temporary period of time." Blessing testified the use of 311 was never discussed as a permanent solution.

Deffenbaugh argues the parties agreed to use 311 as the "exclusive" telephone number for receiving and recording complaints, and that the telephone number of Deffenbaugh would no longer be used for complaints. However, while there is evidence that the parties contemplated that customer complaints to the 311 number could serve as a number for purposes of Section 7.02(a), it is not established beyond a reasonable doubt that the 311 number was the *only* means for registering complaints.

Deffenbaugh's Operations Specialist Kelli Carney, who was provided a license for 311 in 2018, testified that no one at Deffenbaugh ever told her that the UG's 311 system would be the sole source for customer complaints in Wyandotte County. The UG cannot force people to call 311 instead of Deffenbaugh's number when they have a complaint. After Deffenbaugh was provided 311 access, residents continued to report missed collections by calling Deffenbaugh's local 913-631-3300 telephone number (which had been used for at least 24 years).

11

According to Carney, when residents call Deffenbaugh directly to report a missed collection, Deffenbaugh creates tickets in its MAS4 system to resolve those complaints. A direct call from a Wyandotte County customer to Deffenbaugh is forwarded to a call center in Lombard, Illinois. The first response of the company's customer service representatives is to tell the caller that all calls should got through the UG's 311 number.

Once Deffenbaugh was given access to 311, it had the ability to enter complaints into the 311 system. However, Deffenbaugh does not enter service calls it receives into 311.

According to John Blessing of Deffenbaugh, the UG's obligation under the 311 agreement was to educate the public to use 311 for complaints. Blessing testified that the UG did attempt to educate the public as it agreed.

The parties agreed that the use of the 311 number system would be used for Deffenbaugh's obligation to "provide the UG with a telephone number" for complaints under Section 7.02(a). It is uncontroverted there is no written amendment to the Contract to use 311 as the exclusive telephone number or method for receiving, communicating and recording complaints.

Access to 311 allowed Deffenbaugh to directly monitor and resolve service complaints that were reported in 311, including missed collections reported by UG staff members.

When a complaint of a missed collection was entered into 311, Deffenbaugh customer service personnel would check the "3 screen" in its customer service database (MAS) to see if there was a reason why the trash was not collected, such as not being timely set out for collection or not compliant with the requirements of the Contract.

If the check of the "3 Screen" indicated a reason why the trash was not collected, Deffenbaugh noted the reason directly in the UG's 311 system. For example, on May 30, 2019, a caller reported to 311 that "Neighbors across the street trash was not picked up." Deffenbaugh's Kelli Carney noted in 311 that "Per driver not out 7:29 a.m. 5/28/19-KC." In response to a complaint on May 1 for 4227 N. 107th St., Carney reported the trash was not collected because it was construction debris: "Per driver construction debris in container. KC."

If the check of the "3 Screen" did not indicate why the trash was not collected, Deffenbaugh created a "ticket" in its MAS system, which was then dispatched to a driver for collection. Deffenbaugh also entered the same "ticket" number in the 311 system. Deffenbaugh did not (and does not) enter the date and time of resolution of a complaint in 311, although it could do so. The date and time of resolution of a 311 complaint are recorded internally by Deffenbaugh in its MAS system and could be provided to UG if requested.

Deffenbaugh indicated to the UG that customer complaints should go through 311. Deffenbaugh did not tell the UG that it believed reports of missed collections by UG staff should not be considered valid complaints under the Contract.

13

When a complaint was entered in 311 for an entire street or block or neighborhood, Deffenbaugh customer service entered that information on the ticket in its MAS system so the dispatcher and driver would know there were multiple stops that were missed and were to be collected. Deffenbaugh drivers were capable of picking up missed collections if they were provided a boundary of streets rather than specific addresses. When Deffenbaugh received a single complaint for multiple homes it would not create a separate ticket for each address because one ticket was considered by Deffenbaugh to be sufficient for the dispatcher and driver to collect the multiple misses.

**E.**      **The Standard Operation Procedure**

Beginning in May 2018, the UG adopted a "Standard Operating Procedure" to calculate penalties. Under this procedure, UG inspectors would drive to the scene of each 311 complaint, take photographs, and enter a summary of information into a UG online account. The UG determined that a violation existed based solely on what its inspectors saw at a Residential Unit. The UG inspectors did not do anything else besides see the Waste and take a picture. They did not get out of the truck and knock on the Customer's door. In its process for calculating and imposing penalties, the UG did not consider who made the complaint whether it was the Customer at the Residential Unit or a member of the UG staff.

Beginning in June 2019, the UG's procedure for calculating penalties was to start the penalty two days after the 311 complaint, even if it was the UG who had made the 311 call, and not a Customer, and was to end on the date of the last picture taken.

Starting in June 2019, the UG allowed Deffenbaugh a full extra day after the date of the complaint for Deffenbaugh to pick up the uncollected trash, providing that the penalty "per day starts two days after receipt of the 3-1-1 Complaint." This change was intended to make it easier and more consistent to track the volume of missed collections and provided Deffenbaugh with an additional grace period to perform its obligation to collect the trash, thereby resolving the complaint.

F.      **May and June of 2019**

In May 2019 internal emails, Deffenbaugh's Paul Bickford asked: "What's the dotte up against? Going backwards hard." Kelli Carney reported that Deffenbaugh was "getting hammered" with service calls and "also seeing a lot of drivers confirming mpu's [missed pick ups] and not being done."

The UG began imposing penalties in May 2019 because the UG believed it "had to do something to get the attention of [Deffenbaugh] ... so [Deffenbaugh] would start performing according to the contract" and the UG acknowledges that Deffenbaugh's service became "much better now."

The UG's penalty calculations for May 2019 to February 2020 contain or reference all of the information used by the UG to calculate and impose the penalties.  The UG penalty calculations are on 1,226 Residential Units.

The parties dispute the extent to which the UG communicated the grounds for the penalties to Deffenbaugh.  The UG contends that, after Deffenbaugh appealed the imposition of penalties for May 2019, it did supply some information in the form of an excel spreadsheet, and further stated that it had detailed records for additional months. However, there is evidence that the Public Sector Manager for Deffenbaugh specifically complained the UG was relying on customer reports made outside the 311 System, supposedly the "the Single Method of Telephonic Customer Communication Contemplated by the Contract."  What the UG did provide was a two page excel summary, but did not provide the full penalty calculations.[8]

It is uncontroverted that none of the UG's penalty calculations contain any information substantiating that the Waste or recycling was placed Curbside by 7:00 a.m. on the scheduled collection day.  The UG does argue that it was Deffenbaugh's obligation to investigate complaints under Section 7.02(b).

_____

[8]  The UG did offer a substantial amount of information to support its penalty assessments, offering as an example one month's penalty calculations.  But this occurred in March of 2020, in response to Deffenbaugh's termination notice,

In a June 4, 2019 internal Deffenbaugh email discussing trash that remained uncollected from May 31, Deffenbaugh's Paul Bickford stated, "if we don't get this collected ASAP we face steep fines from the City."

The May 2019 311 report contained 364 service complaints. Some 81 of those complaints were for entire neighborhoods, entire blocks, entire streets, entire areas, or one side of a street.

Deffenbaugh maintains a record of both direct calls and 311 complaints in MAS system. On June 12, 2019, Blessing sent an email to Kelli Carney requesting a list of complaints in 311 for May 2019, including the "resolution with date."

The next day, June 13, 2019, Blessing requested all MPU (missed pickup) tickets in Deffenbaugh's MAS system for May 2019, including the date of resolution. In a June 13, 2019 internal Deffenbaugh email, Blessing noted that there were 656 MPU complaints recorded in Deffenbaugh's MAS system, but only 364 in the 311 report. Deffenbaugh agrees a missed pickup is a violation of the Contract.

On June 13, 2019, Blessing responded to the UG's June 11, 2019 request by providing only the 311 report from the UG's own system. Deffenbaugh never disclosed the MPU report from MAS to the UG. The May 2019 311 report did not include the date and time of resolution of the complaints, as had been requested by the UG.

On June 25, 2019, the UG sent another letter to Deffenbaugh again requesting a list of all complaints received by Deffenbaugh, both directly and through the 311 system, including the date and time the complaints were resolved. More importantly,

the UG also notified Deffenbaugh that pursuant to Section 7.02(b) it was deducting $229,700 from the UG's payment of the May 2019 invoice as a result of Deffenbaugh's failure to resolve missed collections.

Deffenbaugh observes that later, on July 15, 2019, UG's consultants found that for May 2019, "a total of $109,600 has been determined as the penalty amount per Section 7.02(b) of the contract." The UG counters that the consultants were using a different methodology, but the evidence is still relevant for determining the amount of the penalty that *should* have imposed. The propriety of the UG's penalties for May 2019 and succeeding months is separately discussed below.

In an internal email, Blessing reported that according to the data for May 2019 there were "104 misses not resolved in 24 hours." Blessing stated that he "added $200 per 24 ours [sic] unresolved (after the first 24) and the total amount for May 2019 is ~$53,900."

Deffenbaugh's Ryan White stated in a June 27, 2019 internal email that based on a review of the data Deffenbaugh was not recovering missed collections within 24 hours: "When reviewing the data it appears we are dispatching recoveries outside of this criteria and/or rolling MPU's which need to be recovered that day."

On July 1, 2019, Deffenbaugh notified the UG that it was appealing the May 2019 withholdings pursuant to Section 7.02(b) of the Contract. The company wrote that it had "received approximately 370 complaints in May and remedied the missed collection within 24 hours of Deffenbaugh's receipt of each such Complaint."

18

On July 4, 2019, the UG again requested that Deffenbaugh provide its records of "all calls received directly from residents by Deffenbaugh personnel and all calls and complaints received from the UG" as well as "the date the complaint was resolved." Deffenbaugh did not respond by providing its internal May MPU report, or the date and time of resolution of any 311 complaints.

On August 6, 2019, the UG sent an email to Deffenbaugh attaching a spreadsheet which, it stated, it had relied upon in calculating the May fines.

Blessing responded the next day stating that Deffenbaugh was reviewing the data, and asked for clarification on six issues. Two days later, the UG provided a response to each of the six requests for clarification. Blessing responded that the additional information from the UG would "help [him] drill down and get accurate information."

On August 12, 2019, Blessing informed the UG that "I have begun our research." He cancelled a meeting he previously requested between "senior leaders" until "after we research this data and provide our response."

Deffenbaugh never provided any of its research or analysis of the May 2019 data or any response to the UG. Instead, on August 16, 2019, Deffenbaugh notified the UG that it would no longer send daily emails reporting incomplete routes, the number of remaining homes on those routes, and the time of completion.

On August 26, 2019, Deffenbaugh's counsel sent a notice to the UG that Deffenbaugh was "rescinding and withdrawing" its appeal of the May 2019 penalties.

19

Deffenbaugh did not appeal any deduction under Section 7.02(b) in any other month other than May 2019.

The UG notes that in May 2019, before it invoked Section 7.02(b), Deffenbaugh had been considering walking away from the Contract.  Deffenbaugh observes that the same underlying evidence indicates that it never completed any analysis of walking away from the contract.  However, it is uncontroverted that, before Deffenbaugh withdrew its appeal on August 26, 2019, it was already discussing ways to terminate the Contract, and that walking away was considered as one option.

On August 26, 2019, the same day the appeal was withdrawn, Deffenbaugh internally circulated an "Executive Summary" in part discussing options for termination of the Contract.  In a November 7, 2019 internal Deffenbaugh email, Blessing asked:

> Is our plan on these short pays to continue to let them pile up and then use them as leverage in contract negotiations? ….  If we do not feel we are going to be able to favorably alter the contract, then these outstanding, unexplained short pay's [sic] could provide us the opportunity to terminate the agreement (which runs to 2032).

Kent Harrell responded: "That has been our strategy—Question is do we want to act yet."

In early 2019, the UG engaged a consulting firm, Burns & McDonnell, to evaluate Deffenbaugh's performance under the Contract and recommend actions to assist in improving performance.  On February 13, 2020, Burns & McDonnell made a

presentation of its findings and recommendations, including an analysis of the number of missed collections by month after a February 2019 reroute.

### G.     Fines Imposed

The UG received an invoice from Deffenbaugh each month from May 2019 through December 2019 in the amount of $630,479.76, and in January 2020 and February 2020 for the amount of $656,036.82, for services performed, and the UG withheld $229,700 from its of the May 2019 invoice, $17,200 from the June 2019 invoice, $37,600 from the July 2019 invoice, $33,400 from the August 2019 invoice, $24,800 from the September 2019 invoice, $59,200 from the October 2019 invoice, $39,800 from the November 2019 invoice, $36,400 from the December 2019 invoice, $76,400 from the January 2020 invoice, and $19,800 from the February 2020 invoice.

For May 2019, the UG calculated penalties in the total amount of $227,400.  The UG has never paid the $2,300 difference between the amount that was withheld from payment of the May 2019 ($229,700) and the amount that the UG calculated as the penalty amount for May 2019 ($227,400).

Deffenbaugh submits that within the May penalty, UG withheld $159,600 based on complaints made by UG employees rather than residents.  The UG disputes this conclusion, arguing[9] that Deffenbaugh acquiesced in such penalties.  But the cited

[9] Dkt. 103, at 8-9.

evidence shows only that Deffenbaugh encouraged the UG staff to enter complaints in the 311 system, not that Deffenbaugh agreed to such non-resident complaints would be a *proper* basis for a § 7.02(b) penalty.

In at least some instances, the UG penalized Deffenbaugh where it had missed pickups based on the UG's own reports, independent of Customer Complaints.  For example, for May 2019 Penalty No. 29, the UG imposed a penalty of $39,200,  after a UG officer observed confirmed that there was uncollected trash in a neighborhood for which some 15 complaints had been received.  The UG officer did not determine that each of an approximately 200 houses had uncollected trash, but calculated a range of addresses based on a real estate database.  The UG staff inspector did not take any pictures.

For May 2019 Penalty No. 31, the UG's imposition of the penalty was based on an initial email by UG staff member Kirk Suther reporting a miss of 15 to 20 homes.  For May 2019 Penalty No.  39, Kirk Suther, a UG staff member, reported the 98 homes besides the homes identified with the Residential Unit addresses in the alleged complaints.  In response, the UG points out that these penalties were not solely based on UG reports.  In the first, there were in many instances other complaints about missed pickups in the area, and in the second, Deffenbaugh had self-reported some 175 missed residences.

Deffenbaugh contends that $93,200 of the May 2019 penalty was premised on missed Residential Unit pickups, even if there was only one complaint of a single

Residential Unit.  The exact amount of the any excess penalty, however, cannot be determined, as Deffenbaugh only submits a basket of penalty invoices, many of which involve complaints that an entire neighborhood or street has been missed.

According to Deffenbaugh, some $50,200 of the penalties were based on complaints made the same day as the scheduled collection.  The UG controverts this contention to the extent that the cited 21 page penalty summary fails to show that it did not allow Deffenbaugh at least 24 hours to correct an issue before imposing a penalty. Deffenbaugh counters in reply that, because the UG did not record the time the issue was resolved, in some instances Deffenbaugh "could have" picked up the trash on a succeeding day in less than a full 24 hours after the time of the original complaint.[10] So the evidence simply establishes that it is possible some penalties were overstanding, but it's not quantified.

Deffenbaugh complains that the UG withheld $35,800 based on complaints where the photos showed that the trash was not placed at the curb.  However, the photographs for these 23 instances show trash which has been placed near, if not immediately at, a roadway.  None of the cited instances show a placement so far removed from the roadway that it would not be reasonably considered "curbside" within ordinary understanding of that term, or as defined by the Contract in Section 1.10.  Further, the definition of "curbside" would in any event need to be construed

---

[10] Dkt.  108, at 16.

together with Section 5.04(b), which requires the collection "regardless of errors … in [its] preparation or placing," and Section 5.04(c), which provides the collector can refuse pickup only if the error in trash placement is "egregious," and if the collector issues a written red-tag notice to the Customer.   None of the photographs show that Deffenbaugh red flagged any of the trash.

Deffenbaugh argues[11] in reply that  the Contract prohibited it from leaving the roadway to pick up the trash.  But the cited provision (Section 5.01) only states that the collector "shall not enter *private* driveways, alleys or yards to collect Waste."  (Emphasis added).  The four photos set out in the Reply all show trash within a few feet of the roadway.  None of the trash is inside any fence or enclosure.  In sum, the court finds that Deffenbaugh has failed to show that the UG erred in imposing fines where because the trash had been improperly placed.

Next, Deffenbaugh contends that $258,600 in penalties were imposed for Residential Units other than those specifically identified in Customer complaints.  The UG disputes this conclusion, but provides no substantial evidence in support of the denial.  The penalty summary records maintained by the UG have been stipulated to, and those records are the only evidence to support the penalty.  Whether these charges, as Deffenbaugh alleges, were "improper" is a legal conclusion  discussed below.

---

[11] Dkt.  108, at 12.

According to Deffenbaugh, $11,600 of the penalties were supported only by photographs showing trash cans with closed lids – meaning that it is possible the trash had been collected, but the resident had failed to retrieve the can from the curb.  This by itself does not mean the penalty was wrongly imposed, however.  The penalty was imposed based on a combination of facts—there having been a complaint, an absence of any indication that Deffenbaugh had collected the trash, the cans still being at the curb, and in some instances photographs from the same time showing other nearby trash with  bags not picked up.  At most, the Court can conclude that some penalties may have been wrongly imposed because trash had been picked up.  But it is not possible to definitively now resolve the issue based on this record.

Deffenbaugh argues that $49,400 in penalties were imposed, even though the UG failed to provide any photograph of the missed pickup.  Although there are photographs for some residences, in most instances the penalties continued for some time after the photo was taken.  However, the absence of photos does not conclusively show a penalty was inappropriate.  Section 7.02(b) does not require the UG to document Deffenbaugh's failures by using any particular procedures.  While Deffenbaugh stresses that photographs were a part of the Standard Operation Procedures adopted by the UG to deal with the missed pickups, nothing in the Contract mandates photographic evidence.

Next, Deffenbaugh challenges $11,600 in penalties premised, it contends, on complaints received on the day before the scheduled collection was to occur.  The UG

argues that it some instances these complaints were simply confirming that Deffenbaugh has missed picking up for the trash the previous collection. A review of the penalty invoices, however, indicates only two instances[12] in which the report suggests the trash has been sitting for some time. Neither directly indicates the trash was missed on a prior collection, and both reports were made by UG officers rather than customers. If the report of trash requiring collection was submitted before the day of the scheduled pick-up, this would not be a "complaint involv[ing] a failure to make a scheduled collection" under Section 7.02(b), triggering Deffenbaugh's 24 hours to cure.

The UG withheld $40,800 from its payments based on a penalty imposed before or on the day of the first Customer complaint.[13] However, as discussed further below, Section 7.02(b) only authorizes penalties after a Customer complaint, and after Deffenbaugh has failed to cure the missed pickup within 24 hours.

Deffenbaugh complains that penalties were imposed in cases where there was a gap between the complaint and inspection, suggesting that in some instances the trash may not have been out continuously during that time period. Thus, the UG imposed May 2019 Penalty No. 20 ($800), on a photograph taken on a Tuesday for a Residential Unit which was on the Tuesday route. It is uncontroverted that Waste would typically

---

[12] September Penalty No. 30 (mayor's aide reported trash has been "sitting out for several days"); October Penalty No. 17 (inspector found mattress "not picked up by Deffenbaugh after [not during] last trash pick up").

[13] May Penalty No. 39.

be placed for collection on a Tuesday if the Customer's route collection day was also on a Tuesday.

The UG controverts the suggestion the penalty was wrongly imposed, as it was based not only on the photograph and inspection from Tuesday May 28, but on a complaint on Thursday, May 23, reporting that Deffenbaugh had missed the pickup for the previous Tuesday.  Deffenbaugh argues that the UG simply assumed the trash seen at the inspection had remained out continuously since the previous Tuesday, this hardly seems like a wildly unfair inference, given the generally poor nature of Deffenbaugh's collection efforts.  Deffenbaugh has failed to prove beyond a reasonable doubt that May 2019 Penalty No. 20 was wrongly imposed.

For August 2019, Penalty No. 18 (totaling $2,600) was based on an alleged complaint on August 20, which was not inspected until August 28 and September 3. Again, however, the court cannot determine on the basis of the record that the penalty was wrongly imposed.  A caller reported on August 20, 2019 that the "recycling had not been picked up in a month."

## H.    Deffenbaugh seeks termination

On February 14, 2020, the day after the Burns & McDonnell presentation, Deffenbaugh internally circulated an Excel spreadsheet titled "Fine Calculator Jan 2019 – Feb 2020.xlsx."  According to Defendant's calculations, for this thirteen month period the "MPU Fine Amount" was $430,200.

On February 21, 2020, Deffenbaugh sent the UG a notice under Section 11.02 of the Contract, stating the Contract would be terminated if the UG's defaults were not cured within 30 days.  Section 11.01 defines an "Event of Default" under the Contract, which includes "(e) either party fails or refuses to perform or observe each and every term, covenant or agreement to be performed or observed by it under this Contract.."

Section 11.02 of the Contract provides:

> Whenever an Event of Default shall have occurred and be continuing, the non-defaulting party shall have the option, in addition to any other 22 remedies that it may have at law or in equity, to terminate this Contract upon 30 days prior written notice to the defaulting party; provided, however, that this Contract shall not be terminated if the default is fully cured prior to the expiration of such 30 day period, or, if the default is not reasonably curable within such 30 day period, the defaulting party shall have within such period commenced diligent and good faith efforts to cure and continued such efforts until the default is fully cured.

Deffenbaugh's letter identified five defaults:

i.   "The UG has imposed penalties on Deffenbaugh in a manner that is contrary to the Contract and without factual support.  Additionally, the penalties imposed by the UG are unenforceable contractual penalties under Kansas law."

ii.  "The UG has failed to pay Deffenbaugh in accordance with Section 2.11 of the Contract and is otherwise improperly withholding monies due to Deffenbaugh under the Contract."

iii. "The UG has failed to adjust the number of residential units and/or compensate Deffenbaugh for the number of residential units served."

iv.  "The UG has refused to abide by the Contract's requirement that 'a telephone number' would be the sole method for customer communications."

> v.   "The UG has failed to refer calls received by the UG concerning the services provided under this Contract."

Deffenbaugh never argued, prior to the termination of the Contract, that Section 7.02(b) was unenforceable.  Deffenbaugh refused the UG's multiple offers to meet to facilitate resolution of the issues, and declined further negotiations in the absence of a plan from the UG to address its concerns.

On March 20, 2020, the UG sent a written response, stating that Deffenbaugh had failed to provide supporting facts, detail or other information to sufficiently explain the alleged defaults so as to allow any potential cure.  The UG asked Deffenbaugh to provide any supporting information.

On March 27, 2020, Deffenbaugh sent a letter to the UG declaring that the Contract had been "properly terminated."

The UG has not paid Deffenbaugh any of the $574,300 in penalties imposed from May 2019 through February 2020.

## I     The House Count Dispute

Section 2.07(a) of the Contract provides:  "Each year thereafter, and no later than May 1 of each year, the parties shall determine the number of Residential Units being collected, which shall then be implemented the following calendar year."  Thus, while the number of houses Deffenbaugh actually services changes, the house count for purposes of billing under the Contract, once determined under Section 2.07, does not

change during the calendar year.  The formula for determining the number of Residential Units under Section 2.07(d) is based on Board of Public Utilities (BPU) accounts.

On April 24, 2017, Blessing emailed to the UG the annual adjustment letter for the "Current House Count" of 49,096 units and rate of $11.61, effective January 1, 2018, for a total billing of $570.004.56 per month.

On May 1, 2018, Blessing emailed the UG the annual adjustment letter for the "Current House Count" of 49,096 and rate of $12.05, effective January 1, 2019, for a total billing of $591,606.80 per month.  In sending the annual adjustment letters, Blessing was attempting to comply with Section 2.07 of the Contract.

On May 21, 2018, Elizabeth Burniston, an employee in the UG GeoSpacial Services department of the UG, sent an email referencing 53,839 "validated" addresses under "Updates after Deffenbaugh QC."  This number was derived from a variety of criteria, such as addresses with a BPU and address with a Parcel ID.  In her email, Burniston was not trying to calculate the number of "Residential Units" for billing pursuant to Section 2.07(d).

On June 18, 2018, the UG informed Deffenbaugh that the number of addresses based on BPU data increased by an even 600 homes.  Deffenbaugh responded by challenging this even number, and asking for how the new total of homes had been determined.  Deffenbaugh threatened to suspend some services.  Eventually the UG agreed to pay for 52,804 residences beginning in 2019.

30

On November 19, 2018, the UG sent an email indicating a billable house count number based upon BPU data was 47,427.  Blessing responded that if the Bonner Springs, Kansas addresses were included, the total billable number would be 49,772. Blessing informed the UG "this will result in the potential discontinuation of 3,899 addresses."

On November 28, 2018, Deffenbaugh told the UG that Deffenbaugh would stop service to 6,247 addresses if Deffenbaugh did not receive payment of back billed invoices (based upon 53,671 units) by December 6, 2018.

On December 7, 2018, the UG sent written notice that it would agree to pay based on a house count of 52,804 beginning January 1, 2019.  Ex.

That same day, December 7, 2018, Carl Niemann wrote in an internal Deffenbaugh email that Deffenbaugh would "NOT be shutting off service in KCK on Monday" and that "the promise to pay the higher house count effective January 1, 2019 demonstrates good faith on behalf of the UG."

In a February 20, 2019 internal Deffenbaugh email, Blessing stated that Deffenbaugh's "threat to suspend service ...  forced the UG to make the concession to pay for the 52,804 number starting Jan 1st 2019."

John Blessing acknowledged in a February 2019 internal email to Kent Harrell that the Contract language (referring to Section 2.07) does not support Deffenbaugh's position on house count: "[U]nfortunately, the current contract language does not support our position on house count adjustments and billing."

Deffenbaugh continues to bill the UG based upon 52,804 residential units agreed upon in December 2018.

**Counterclaims**

The UG has asserted claims for additional penalties both before and after the period during which it deducted penalties from its payments to Deffenbaugh. For the prior period, from June 2018 to April 2019, the UG seeks $540,800 in penalties. In advancing this claim, UG has not used data for any specific residential units. Rather, it contends that, because Deffenbaugh's performance in terms of missed collections was consistently bad, it estimates that Deffenbaugh also incurred penalties for the earlier time period, based on the $33,822 average penalty imposed for from 2019 to December 2020 (excluding the outlier months of May 2019 and July 2020).

The UG has also asserted a claim for penalties for the period after the termination of the contract, from April 2020 to April 2021.

The UG has asserted a claim for "employee/staff time, costs and expenses" in 2017, 2018, 2019 and 2020. According to its Mike Tobin of the UG, the amount sought is based on the government's work in "determining whether the trash is being picked up." For the period from 2017 to 2019, the UG did not keep contemporaneous records of the actual amount for employee time and expenses incurred on Deffenbaugh issues. These calculations were undertaken recently, based on estimates of the amount of time staff spent on Deffenbaugh issues.

The UG has asserted a claim for amounts paid to Burns & McDonnell in the amount of $73,500. The UG engaged this consulting firm in 2019 to evaluate the performance of Deffenbaugh and Deffenbaugh.

Deffenbaugh contends that Burns & McDonnell performed other work for the UG not related to the penalty issue, including an evaluation of the affordability of rates, carts, and equipment, particularly for low income residential customers. Although the UG contends that this work was subject to a separate purchase order, the testimony of the corporate representative indicates that the separate purchase order related to a solid waste contract. The deposition continues, indicating that some part of the $73,500 charges relates to affordability issues.[14]

In Count 2 of its Complaint, the UG sought a preliminary injunction prohibiting Deffenbaugh from terminating service under the Contract during pendency of this litigation. Waste Management committed to continue to provide service under the Contract during the pendency of the litigation.[15]

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a

---

[14] Tobin dep. at 143 (UG's representative testifying he does not know how much of the $73,500 was related to reviewing penalty calculations).

[15] Pretrial Order, at 52.

matter of law.[16] A fact is "material" when it is essential to the claim, and issues of fact

are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in

either party's favor.[17] The movant bears the initial burden of proof, though "a movant

that will not bear the burden of persuasion at trial need not negate the nonmovant's

claim."[18] Such a movant "may make its prima facie demonstration simply by pointing

out to the court a lack of evidence for the nonmovant on an essential element of the

nonmovant's claim."[19] The nonmovant must then bring forth "specific facts showing a

genuine issue for trial."[20] These facts must be clearly identified through affidavits,

deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot

survive a motion for summary judgment.[21] Conclusory allegations are not sufficient to

create a dispute as to an issue of material fact.[22] The court views all evidence and draws

"reasonable inferences therefrom in the light most favorable to the non-moving

party."[23]

---

[16] Fed.R.Civ.P. 56(a).

[17] *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017)..

[18] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986))..

[19] *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325)..

[20] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). See D. Kan. Rule 7.4.

[21] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[22] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[23] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cty. Nat'l Bank,* 222 F.3d 800, 806 (10th Cir. 2000)).

### III.    Analysis

Deffenbaugh argues that Section 7.02(b) is an unenforceable penalty clause, and that it properly terminated the Contract.  Even if the clause is enforceable, it argues, the UG's withholdings did not comply with the terms of Section 7.02(b), and accordingly Deffenbaugh is entitled to a return of the $574,300 withheld from its invoices. Deffenbaugh also argues that the court should grant summary judgment against the UG on its counterclaims.

The UG argues that Section 7.02(b) is enforceable, that Deffenbaugh failed to properly terminate the Contract, and that in any event it cannot claim the UG violated the Contract when Deffenbaugh had previously violated the Contract itself by its poor collections service.  The UG argues that some of the Section 7.02(b) penalties were properly imposed, and that Plaintiff has failed to show any default based on any violation of a house count agreement or a 311 number agreement.

The Court finds that Section 7.02(b) is enforceable, that Plaintiff did not effectively terminate the Contract in March 2020, and that the UG may not invoke the defense of prior material breach given the parties course of dealing.

The Court finds that Deffenbaugh is not entitled to a complete return of all penalty deductions on the grounds stated.  Rather than delving into an individualized review of hundreds of penalties, the Court offers a construction of Section 7.02(b) which should assist the parties in reviewing the penalties which were imposed, and which indicates that in many instances such penalties were not consistent with the terms of the

Contract.  In other instances, the decision of whether the penalties were proper remains a decision for the trier of fact.

## A.     Section 7.02(b) is Enforceable

The parties dispute the enforceability of Section 7.02(b).  Deffenbaugh argues that the clause is an unenforceable penalty clause, pointing to the express use of the term "penalty," and the testimony of a staff worker for the UG stating that the purpose of the clause was to ensure Deffenbaugh's compliance with the Contract's terms.  The UG argues that the clause is effectively a liquidated damages clause, which violates no rule of Kansas law.  The court finds that the clause is not an unlawful or unenforceable penalty.

Before turning to the merits of the parties' enforceability arguments, the Court first addresses the preliminary argument of the UG that Deffenbaugh is precluded from claiming Section 7.02(b) is unenforceable by the statute of limitations and the doctrine of laches. Under Kansas law, a cause of action based on a written contract must be brought within five years.[24]  Noting that Kansas law also provides that "[a]ny person having an interest under a deed, will, written contract or other writings constituting a contract … may obtain a declaration of rights, status or other legal relations thereunder,"[25] the UG

---

[24] K.S.A. 60-511(a).

[25] K.S.A. 60-1704.

argues that Deffenbaugh could have sought a declaration the penalty provision was invalid as soon as the Contract was executed in 2012.

The Declaratory Judgment Act itself contains no statute of limitations of its own. Accordingly, courts look to whether "the limitations period has run on a direct claim to obtain such relief. What determines the applicable limitations period is the basic nature of the suit in which the issues involved would have been litigated if the Declaratory Judgment Act had not been adopted."[26]

However, "[b]efore a party may bring a declaratory judgment action, there must be a genuine legal dispute between the parties."[27] Here, Plaintiff is not charging that the Contract was void from the beginning in 2012 for some reason such as fraud, duress, or a want of consideration.  The conflict arose only in 2019 after the UG began to impose penalties which, Deffenbaugh alleges, reflect an overexpansive interpretation of Section 7.02(b). Plaintiff's argument that Section 7.02(b) is unenforceable as an unlawful penalty is more akin to a claim a particular provision is unlawful or unconscionable.

> Typically, unconscionability is raised as a defense to a breach of contract claim. It may be brought as a stand-alone claim for declaratory judgment, but usually it pertains to a contract that is still in operation and is raised as justification for a party's decision to stop complying with the terms of a contract or to stave off the other party's attempt to enforce a particular provision (such as an arbitration provision). In such situations as those, the fact that the contract was formed more than six years prior to the

---

[26] *Ace Property & Cas. Ins. Co. v. Superior Boiler Works*, 504 F.Supp.2d 1154, 1159-60 (D. Kan. 2007) (internal quotations and citations omitted).

[27] *Santa Rosa KM Assocs. v. Principal Life Ins. Co.*, 41 Kan.App.2d 840, 858, 206 P.3d 40 (2009), *rev. denied* 290 Kan. 1095 (2010).

> initiation of a lawsuit would not prevent a party seeking to avoid its
> obligations under a contract to raise unconscionability as a defense or as
> an affirmative claim, because the controversy accrues, not upon the
> formation of the contract, but at the time a party challenges its
> enforcement or enforceability.[28]

Thus, the limitations period for the argument Section 7.02(b) is unenforceable began when the UG began to enforce it.

This is particularly true where much of the argument by both parties turns on the amount of the penalties imposed and the expansive interpretation of Section 7.02(b) adopted by the UG. The UG has pointed to no evidence showing that Deffenbaugh had notice of this expansive interpretation prior to 2019, and the Court finds the Plaintiff's claim is not time-barred.[29]

The same result holds true for the UG's laches argument. Laches will bar a claim which is not brought "for an unreasonable and unexplained length of time, and the lapse of time and other circumstances cause prejudice to the adverse party."[30] But, "courts have generally held that laches cannot be used to bar claims incurred within a

---

[28] *Second Ave Museum v. RDN Heritge*, 2021 WL 4267291, at *15 (M.D. Tenn. 2021).

[29] *Ace Property*, cited by the UG, is distinguishable.  In that case, the insurer plaintiffs sought a declaratory judgment action in 2005. The court held that the claim, seeking a declaration of rights under an insurance policy, was time-barred. The court noted the defendant insured had expressly rejected the plaintiffs' demands for cost sharing in repeated letters in 1995 and 1996, meaning "plaintiffs were aware that defendant did not intend to pay the asserted obligation" for "nearly nine years." 504 F.Supp.2d at 1161. The UG here points to no similar correspondence stating its broad construction of Section 7.02(b).

[30] *Steele v. Guardianship & Conservatorship of Crist*, 251 Kan. 712, 840 P.2d 1107, 1117 (Kan. 1992

limitations period set by statute."[31] Here, as just noted, Deffenbaugh brought its claim seeking a determination the penalty clause with a year of the period that the UG began to consistent impose large penalties, well within the express five-year limitations period prescribed by statute.   Nor has the UG pointed to any particular prejudice from addressing the matter now, beyond the need to document the penalties it began to impose and offer support for its interpretation.

In interpreting a contract, Kansas courts will focus on the parties' intent.[32] " If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction."[33] The court will construe the contract based on its four corners—not by isolating one sentence or provision.[34] Kansas interprets contracts by "assigning the words used their plain and ordinary meaning."[35] "The interpretation and legal effect of a contract is a question of law for the court to decide."[36]

---

[31] *Matter of Marriage of Doud & Modrcin*, 59 Kan. App. 2d 244, 480 P.3d 800, 807 (2020) (citing *SCA Hygene Prods. v. First Quality Baby Prods*, 137 S.Ct. 954, 963-64 (2017).

[32] *CRK Development v. Buckhead Lakeside Homeowners Ass'n*, 2021 WL 2750518, *1 (Kan. App. 2021).

[33] *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015)..

[34] *Waste Connections of Kansas v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250 (2013).

[35] *Pfeifer v. Fed. Exp. Corp.*, 297 Kan. 547, 304 P.3d 1226, 1229 (2013).

[36] *Wolfe Elec., Inc. v. Duckworth*, 293 Kan. 375, 266 P.3d 516, 534 (citation omitted) (2011) (citing *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011)).

An unenforceable "penalty" under Kansas law is a forfeiture for breach which amounts to "a punishment for default, without regard to actual damages."[37] In support of its claim that Section 7.02(b) is such a penalty, Plaintiff points to language from several decisions indicating that, in distinguishing between a penalty and liquidated damages, courts will sometimes defer to the language used by the parties.  In particular, Deffenbaugh relies on the observation in *Carrothers Construction v. City of South Hutchinson* that the language used by the parties is "ordinarily accepted as controlling unless the facts and circumstances impel a contrary holding."[38] Further, Plaintiff notes, while Section 7.02(b) expressly uses the term "penalty," another provision (Section 3.07) expressly provides for "liquidated damages" under other circumstances, thus creating the inference that Section 7.02(b) is indeed meant to be a penalty.[39] Finally, Deffenbaugh stresses the mismatch between the penalty for a missed pickup ($200 per 24 hour period) in contrast to what it was paid for a week pickup (roughly $10), as well as the fact that UG had not undertaken an separate calculation of an appropriate damages for missed pickups.

---

[37] *White Lakes Shopping Ctr.  v. Jefferson Standard Life*, 208 Kan. 121, 490 P.2d 609, 613 (1971).

[38] 288 Kan. 743, 207 P.3d 231, 241 (2009) (citation omitted).  *See also cf.  Wahlcometroflex, Inc.  v. Westar Energy,* 2012 WL 2366693, at *4 (D. Kan. 2012), *aff'd,* 773 F.3d 223 (10th Cir.  2014) ("In this case, the Contract provides that the contemplated liquidated damages are not penalties.  Wahlco does not present any contrary evidence for the Court not to accept these words as controlling.").

[39] *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.,* 499 F.3d 1151, 1156–57 (10th Cir.  2007) (applying Kansas law) ("When a contract uses different language in proximate and similar provisions, we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings.")

Despite these points, however, the court finds that Section 7.02(b) is not an unenforceable penalty.  The single sentence Plaintiff cites from *Carrothers* does not establish that the terminology used by the parties is controlling, or even the most important consideration for the court.  The quoted language is taken from a larger discussion which establishes that the label used by the parties is *not* controlling:

> In determining whether contractual agreements are to be treated as penalties or as liquidated damages, *courts look behind the words used by the contracting parties* to the facts and the nature of the transaction.  The use of the terms 'penalty' or 'liquidated damages' in the instrument is of evidentiary value only.  It is given weight and is ordinarily accepted as controlling unless the facts and circumstances impel a contrary holding.  The instrument must be considered as a whole, and the situation of the parties, the nature of the subject matter and the circumstances surrounding its execution taken into account.[40]

Other Kansas authorities support this conclusion.  For example, in the 1941 case of *Beck v. Megli*, which *Carrothers* was quoting throughout this passage, the court stressed that "we are concerned with the nature of the provision" in dispute between the parties, "whether or not it be called a penalty."[41]

_____

[40] *Carrothers*, 207 P.3d at 240 (quoting *Beck v. Megli*, 153 Kan. 721, 726, 114 P.2d 305 (1941)) (citations omitted, emphasis added).  Other decisions are to similar effect.  In *White Lakes Shopping*, 490 P.2d at 614, the court observed that the parties' actual language—which referred to the forfeiture as liquidated damages—"should be given some effect," but was "not conclusive."  *See also Unified Sch. Dist. No. 315, Thomas Cty. v. DeWerff*, 6 Kan.App.2d 77, 626 P.2d 1206, 1208 (1981) ("The use of the term 'penalty' throughout the provision does not, as a matter of law, defeat the trial court's finding that the provision was, in fact, a liquidated damages clause.").

[41] 114 P.2d at 308.  *Beck* cites as authority *Condon v. Kemper*, 47 Kan. 126, 27 P. 829, 832 (1891) where the court quotes as "instructive" the observation in *Jaquith v. Hudson*, 5 Mich. 123, 136-137 (1858) that whether a given clause is a penalty is "determined by the magnitude of the sum, in connection with the subject-matter, and *not at all by the words* or the understanding of the parties."  (Emphasis added).

Moreover, the Kansas Supreme Court did not write in *Carrothers* and *Beck* that the party's terminology will govern "unless the facts and circumstances *compel* a contrary holding." It chose the much different term "impel" — a word which may mean simply to encourage, incite to action, or to induce, influence, or urge.[42] Between the two terms, "compel is the stronger word, connoting force or coercion, with little or no volition on the part of the one compelled. Impel connotes persuasive urging, with some degree of volition on the part of the one impelled."[43] Kansas courts recognize the distinction.[44] Accordingly, the sentence cited by Deffenbaugh simply means that the labels used in the contract will control unless the circumstances of the case reasonably suggest or support a different conclusion.

Finally, the relatively limited weight given the parties' labels is also reflected in the conclusion of the extended passage from *Carrothers* and *Beck*:

> There are two considerations which are given special weight in support of a holding that a contractual provision is for liquidated damages rather than a penalty—the first is that the amount stipulated is conscionable, that it is reasonable in view of the value of the subject matter of the contract and of the probable or presumptive loss in case of breach; and the second is that the nature of the transaction is such that the amount of actual damages resulting from default would not be easily and readily determinable.[45]

---

[42] *See Middleton v. Murphy*, 1993 WL 217156, at *1, n. 1 (7th Cir. 1993) (citing WEBSTER'S NEW INTERN. DICT., 1248 (2d ed. 1957)). The OXFORD ENGLISH DICTIONARY recognizes the same principle, that "impel" may mean simply "to urge on" a given result. *See id*. (quoting Alexander Pope, *Essay on Man*, II. 68 ("Active its task, it prompts, impels, inspires.")).

[43] Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE 130 (1987).

[44] *State v. Braun*, 47 Kan. App. 2d 216, 219, 273 P.3d 801, 803 (2012) (quoting Garner).

[45] *Beck*, 114 P.2d at 308.

Both of these "special weight" considerations ultimately support the determination that Section 7.02(b) is enforceable.  As to the first, the UG argues the amount of the penalties under this clause could be viewed in relationship to the total value of the Contract to the parties.  Here, during the lifetime of the Contract (from January 2012 to May 2021), Deffenbaugh has invoiced the UG for some $64 million.  Thus, the $574,000 in total penalties imposed by the UG reflect less than 1% of Plaintiff's income from the Contract. [46]

However, the Court finds that for resolving this first special weight consideration, the $200 charge for missing a pickup at a residence should be weighed against how much Deffenbaugh was paid for making such pickups.  While the penalty for a missed pickup was substantially more than the $ 9 to 11 in revenue which Deffenbaugh earned per residence, there are several reasons why the court finds the figure was remains conscionable.

"Under Kansas law, a contract is substantively unconscionable when its wording or application is so unfair that it shocks the conscience, offends the sensibilities of the court or is against public policy."[47] Procedural unconscionability "has generally been

---

[46] In *White Lakes Shopping*, 114 P.2d at 308-09, the court concluded that "[i]t cannot be said that the $500 was an unconscionable or unreasonable amount to be paid as damages in the case of default on a contact of that magnitude," upholding the forfeiture as liquidated damages 5% of a $10,000 contract for the purchase of a flower mill.

[47] *Biglow v. Dell Technologies*, 2021 WL 1784559, *5 (D. Kan. 2021) (citation omitted).

recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."[48]

The Kansas Supreme Court has recognized that "the doctrine of unconscionability is difficult to define precisely," but has noted ten potentially relevant factors for resolving a claim of unconscionability.[49] Of these ten, only one ("the inclusion of penalty clauses") is even potentially relevant, and then only in a question begging fashion — the key issue here being whether Section 7.02(b) is an *unlawful* penalty.

All nine of the remaining factors cut strongly against a determination of unconscionability. The Contract was specifically negotiated by a governmental entity

---

[48] *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (6th Cir. 1965) (citation omitted).

[49] *Wille v. Sw. Bell Tel. Co.*, 219 Kan. 755, 758, 549 P.2d 903, 906–07 (1976). The court explained that the factors include:

> (1) The use of pinted [sic] form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power.

*Id.* at 758-59 (citations omitted).

and a large and sophisticated corporation. Deffenbaugh is not a consumer, nor is it to be numbered among "the underprivileged, unsophisticated, uneducated and the illiterate." Plaintiff has not documented any substantial inequality of bargaining power between it and the UG. The "penalty" clause was not hidden in fine print, nor is its language incomprehensible. The penalty amount was specifically modified during the course of dealing between the parties.

The $200 charge, it must be noted, did not shock *Plaintiff's* conscience — it voluntarily entered in the Contract with this explicit provision, and then patiently paid (or silently allowed to accumulate) hundreds of thousands of dollars for stipulated damages. If Plaintiff's conscience was not shocked by this formula, and it cannot reasonably expect the Court's sensibilities to be more delicate.

Further, while the $200 charge per missed pickup is certainly substantial, it is not necessarily unreasonable in itself, given the procedural limitations in Section 7.02(b). These "penalties" are imposed only if (1) Deffenbaugh failed to pick up collectible trash, (2) a Customer complained, and (3) Deffenbaugh failed to timely remedy the problem. Section 7.02(b) has its own procedures and protections for Deffenbaugh. These are limitations discussed elsewhere in the present Order, but the relevant point is that Section 7.02(b) is not an automatic charge whenever there is a missed pickup; it authorizes a penalty only if certain conditions are met, demonstrating a compound failure by Deffenbaugh. Any specific penalty (assuming it was properly imposed under

45

the terms of Section 7.02(b)) was thus a matter entirely within the control of the trash collector.

The second of the two special considerations identified in *Carrothers* arises where the parties cannot readily determine the actual amount of damages from nonperformance. The uncontroverted facts establish that uncollected trash creates a public health hazard, which cannot be easily quantified or determined.[50] Public service contracts, like the one in dispute in this case, are particularly appropriate vehicles for such clauses.[51]

The Eighth Circuit (acting as predecessor to the current Tenth) recognized this distinction in upholding an early decision from this court. The court found that the City of Wichita had not violated plaintiff's rights by holding forfeit a deposit made to ensure the building of 150 arc lights for the city.

> Cases of penal bonds between private persons, where the damages resulting from a breach are readily ascertainable, have no application to this case. A city is a public corporation designed for local government. It is an agency of the state to assist in the civil government of the territory and people of the state embraced within its limits. It has no private interests. It is a public agency, and acts for the public; and when it contracts for the establishment and maintenance by a private corporation of waterworks, gas or electric lights, street railroads, and other like public utilities, it does so in the performance of its public functions, and for the purpose of promoting the convenience and preserving the health of its

---

[50] *See Ennis v. City of Ray*, 595 N.W.2d 305, 311 (N.D. 1999) (recognizing "the tangible benefits of a uniform system of [garbage] collection to protect the public heath").

[51] *See, e.g., Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947) (stipulated damages provisions "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts").

citizens, and protecting them in their persons and property. And when a private corporation which has engaged with the city to construct and maintain one of these public utilities—as in the case at bar, to light the public streets of the city—fails to comply with its contract in that regard, the city, in its corporate capacity, does not suffer any loss or damage capable of judicial ascertainment. Nor is the inconvenience and loss suffered by the public, on whose behalf and for whose benefit and protection the contract was made, capable of ascertainment. The loss and damage sustained by the public, however great it may be, in the loss of health or life or the destruction of property, is too remote, conjectural, and speculative to be made the basis of recovery in such cases. For this reason it is common for municipal corporations, in making contract of this character, to stipulate for the payment of a fixed sum as liquidated damages in case the public utility is not constructed and put in operation within the time limited by the contract. This is the only method by which the city can obtain anything like an adequate compensation for the loss and damage sustained by the public by the breach of such a contract. The sum forfeited as liquidated damages goes into the treasury, and inures to the benefit of the public.[52]

More recent decisions are consistent. Thus, in *Carrothers*, the case otherwise

relied upon by Deffenbaugh, the court observes:

It is uniquely difficult to calculate damages to the general public interest caused by a contractor's breach of its agreement to provide public improvements. This should be an important consideration in such cases and weigh favorably in finding a liquidated damages provision to be reasonable. Kansas has long recognized the protection of the public interest is a proper consideration in determining validity of a liquidated damages provision.[53]

---

[52] *Brooks v. City of Wichita*, 114 F. 297, 298-99 (8th Cir. 1902) (citations omitted).

[53] 207 P.3d (citing *Kansas City v. Industrial Gas Co.*, 28 P.2d 968 (Kan. 1934)); U.*S.D. No. 315 v. DeWerff*, 626 P.2d 1206, Syl. ¶ 3 (Kan. App. 1981*)*. As to the dangers of uncollected trash*, see In re Enlargement & Extension of Corp. Limits of City of Madison*, 983 So.2d 1035, 1045 (Miss. 2008) (insufficient trash pickup "contributes to uncollected waste in the area, which in turn contributes to the spread of disease"); *District of Columbia v. Sierra Club*, 670 A.2d 354, 363 n. 11 (D.C.Ct.App. 1996) (uncollected garbage "could have intolerable consequences for residents"). On the importance of trash collection generally, *see Zerr v. Tilton*, 224 Kan. 394, 581 P.2d 364, 369 (1978) ("[t]he protection of the health and welfare of the citizens requires the safe and sanitary disposal of solid waste"); *O'Neal v. Harrison*, 96 Kan. 339, 150 P. 551, 551–52 (1915)

47

Accordingly, both of the special weight considerations strongly support the enforceability of Section 7.02(b).  As noted earlier, the language used by the parties is generally accorded less weight, as the court is concerned with the *nature* of the provision, "whether or not it be called a penalty."[54] Section 7.02(b) is not unconscionable and provides compensation for a governmental entity where actual damages are difficult or impossible to properly assess.

"[T]he burden of proving a liquidated damages clause is an unenforceable penalty falls on the party challenging the provision."[55] Beyond the labels used in the Contract, Deffenbaugh has failed to point to specific evidence which would satisfy this burden.  Deffenbaugh does note, for example, the Rule 30(b)(6) testimony of Michael Tobin.[56] Tobin was asked if he knew of any studies or investigations by the UG to support Section 7.02(b), and responded that "the very clause was part of the original contract, the '93 contract, just to ensure performance."

But this carries far less weight than Deffenbaugh seems to assume.  *All* clauses which provide for clear, fixed damages, and thus avoid difficult questions of proof—

---

("Garbage matter and refuse are regarded by the decisions as inherently of such a nature as to be either actual or potential nuisances") (citation omitted).

[54] *Beck*, 114 P.2d at 308.

[55] *Carrothers*, 207 P.3d at 241.

[56] Deputy Director of Public Works for the UG.  As the UG notes, the outside attorney who drafted the Contract, William Brashares, has averred that he included the provision simply because he believed that it was reasonable and because it or something like it was customary in the industry.  It is noteworthy that Deffenbaugh, a nationwide trash collection service, has failed to offer evidence that the penalty clause in its Contract with the UG is in fact not customary, or is at least unusual in the industry.

whether they are unlawful penalties or perfectly valid liquidated damages clauses—
have the effect of stimulating compliance. "[B]ecause 'the possibility of a damage
award ... by its nature ... induce[s] performance,' the mere fact that a liquidated
damages provision encourages a party to perform, rather than to breach, does not make
it a penalty."[57]

Finally, the Court notes the lengthy, nearly three decades long, history of the
contractual relations between the parties. Throughout this time, Deffenbaugh never
gave any indication that it believed that Section 7.02(b) was unenforceable. This silence
remained in place even when the UG first imposed a substantial penalty, and
Deffenbaugh advanced, and then withdrew, an appeal of the assessment. And the
silence continued, even as the UG imposed substantial monthly penalties beginning in
June 2019. All of this strongly suggests that, notwithstanding Plaintiff's current
argument, the parties intended Section 7.02(b) to be only a valid liquidated damages
provision, counterbalancing the "penalty" label actually used in the Contract. In any
event, as noted above, the key "special weight" considerations (that the stipulated
damage amount is conscionable and serves to protect public health) support the
ultimate conclusion that Deffenbaugh has failed to show Section 7.02(b) is
unenforceable.

---

[57] *Holloway Automotive Group v. Lucic*, 163 N.H. 6, 35 A.3d 577, 581 (2011) (quoting 24 R. Lord, WILLISTON ON CONTRACTS, § 65:1, at 231 (4th ed. 2002). *See also Weber, Lipshie & Co. v. Christian*, 52 Cal.App.4th 645, 656, 60 Cal.Rptr.2d 677, 682 (1997) ("[a] liquidated damages provision is not invalid merely because it is intended to encourage a party to perform").

**B.      Termination**

The parties dispute whether Deffenbaugh validly terminated the contract in 2020.  "A termination provision is binding and will be enforced just as other parts of the contract."[58] But whether a notice is sufficient under a contract requires consideration of whether the recipient is "given an adequate opportunity to cure" the alleged default, particularly where the nature of the default is "a matter particularly within the knowledge of [the sender]."[59] Deffenbaugh argues that the notice it issued was sufficient under the terms of the Contract to terminate further obligations; the UG argues that although the notice by Deffenbaugh contained a few bullet points, they were complete generalities, and were not calculated to give it the opportunity to cure any actual defaults.

As the UG notes, "[i]nherent in the opportunity to cure a default is knowledge of what is in default.  Absent knowledge of what must be corrected in order to avoid the specified penalty, the right to cure the default becomes a meaningless guessing game."[60] Deffenbaugh correctly notes that in the cited case, the lease provided for default for non-payment if the failure continued for 10 days after "written notice *specifying* such

---

[58] *The American Outdoorsman, Inc.  v. Pella Products, Inc.*, No.  95,416, 2006 WL 3000779, at *7 (Kan. App. 2006).

[59] *Id.*  at *6.

[60] *In re Valley View Shopping Ctr.*, 233 B.R.  120, 124 (Bankr. D. Kan. 1999) (quoting  *Gallagher v. Borden, Inc.*, 84 Ohio App.3d 185, 188 616 N.E.2d 577, 579 (1992)).

50

failure."[61] But while the Contract here does not expressly require "specifying" particular defaults, the underlying principle of the cited cases remains applicable – termination provisions based on a failure to cure a default contain an implicit requirement to give enough detail to allow cure.

Notably, Deffenbaugh does not mention or respond to any of the other authorities cited by the UG in support of the same principle. For example, in *Pivotal Colorado, II, LLC v. Triple M Beteiligungs-GMBH & Co KG*,[62] the court adopted a similar view even though the contract did not explicitly call for "a specific level of detail." The court held:

> The plain meaning of Paragraph 4(b) provides Pivotal an opportunity to cure in the event of an alleged breach before default, with its severe attendant consequences, could be declared. Even though the contract does not prescribe the contents of the notice of breach, thus giving TMK discretion, TMK had a good faith duty to provide sufficient detail to make the opportunity to cure a meaningful contract right….

> I conclude that TMK's notice was insufficient as a matter of law because it did not provide Pivotal with enough information to investigate or correct the alleged breaches. The notice gave only alternative theories of breach in the most general terms without any explanation or detail. Given the extensive nature of the zoning map and guidelines, the absence of detail makes any cure guesswork, at best.[63]

---

[61] 233 B.R. at 124.

[62] 2009 WL 1174463, at *3 (D. Colo. Apr. 29, 2009).

[63] *Id.* *See* 5 Bruner & O'Connor CONSTRUCTION LAW § 18:41 (citations omitted), observing:

> To serve its remedial purpose, the cure notice must fairly appraise the breaching party of the specific breaches considered to warrant termination. The cure notice must describe the inadequate performance and must fairly advice (sic) the breaching party that the non-breaching party considers the inadequate performance serious enough that, without prompt correction, the contract will be terminated. The cure notice must thoroughly define the parameters of the problem.

Deffenbaugh argues that the UG had effective notice under the circumstances, but points to few facts to support its position.  First, it notes its appeal of the penalties imposed for $229,700 for May 2019, meaning that  "as of July 1, 2019, the UG had notice of [the] ways in which [Deffenbaugh] maintained the UG breached the Contract."  (Dkt. 104, at 26).   Second, they argue that the UG should have known that it was overcharging because its penalty figures were in disagreement with those of its own consultant.  Third, it notes the UG's response of February 25, 2020.

But all of these show only a general knowledge that there was a dispute about the fines, not the nature of the dispute.  The UG duly asked for details and Deffenbaugh refused to respond.

 Deffenbaugh had raised a previous appeal as to one month's penalty, but it dropped the challenge after receiving additional documentation from the UG.  More importantly, the appeal did not advance any of the particular contract constructions which Plaintiff now advances in the present action (for example, that only "Customer" complaints may trigger Section 7.02(b) penalties).  Nor did the notice give any specific lower figure for penalties which might have been appropriate.

---

*See also Lewis v. State, Dept. of Revenue*, 207 Mont. 361, 373, 675 P.2d 107 (Mont.  1984) ("the default notice did not give details sufficient to inform defendants how they could correct the deficiency"); *240 W.  37th LLC v. BOA Fashion, Inc.*, 2009 WL 2603146 (N.Y. App. Div. 2009) ("it is imperative that the cure notice particularize the nature of the default(s) with clarity and factual basis," and the "mere reference to or recitation of a numbered lease provision, without specifying the nature of the violation(s), is insufficient").

Deffenbaugh's reliance on the lower penalty calculation supplied by the UG's consultant is also not a cure for its conclusory notice.  The UG notes that the consultant applied a different methodology than it used in determining the appropriate penalty. More importantly, whatever methodology the consultant may have used, this would not have informed the UG of what *Deffenbaugh* was alleging was wrong with the penalty deductions, as so reasonably allow for a timely cure.  It would not give he UG an explanation for how to cure when it didn't know what Deffenbaugh's arguments were.

Deffenbaugh argues that, even if the 2020 letter failed to explain the grounds for termination, this has since been corrected, as "the Complaint in this case, filed on April 17, 2020, alleges how the UG breached the agreement."[64] Deffenbaugh cites the Kansas case of  *Groendycke v. Ellis* for the proposition that "[t]he 'filing and maintenance' of litigation can be the basis for notice and the pre-suit notice 'becomes unimportant.'"[65] Thus, Deffenbaugh argues, because the UG has not cured after the filing of the complaint, the Contract has been terminated.

In *Groendycke*, however, the lessors gave notice of termination in 1963, and then brought suit in 1964 for termination, and, during the lengthy course of the litigation, sent (in 1968) an additional notice of termination.  The lessees only challenged the sufficiency of the *post-suit* 1968 notice, and the court held that it was this post-suit notice

---

[64] Reply, Dkt.  104, at 27.

[65] *Id.*  (quoting *Groendycke v. Ellis*, 205 Kan. 545, 548, 470 P.2d 832, 835 (1970)).

that was "unimportant," given that in the 1963 notice and the litigation during which the lessors "have continuously sought cancellation in this action."   205 Kan. at 549. *Groendycke* does not stand for the proposition that subsequent litigation may substitute for inadequate pre-suit contractual notice.

Moreover, Deffenbaugh has not pleaded that the contract has been terminated by any mechanism other than the alleged failure to cure between February 21 and March 22, 2020.  In the Pretrial Order, Deffenbaugh alleges that it

> provided notice that it was exercising its option to terminate the Contract upon 30 days prior to written notice sent February 21, 2020.  The UG failed to cure its defaults within 30 days of Deffenbaugh's written notice of termination on February 21, 2020.  Thus, the Contract has been properly terminated.  The UG contends the contract was not terminated on March 22, 2020.  In Count I of the Complaint, Deffenbaugh seeks a judgment from the Court declaring the termination of the Contract was effective March 22, 2020.[66]

Deffenbaugh has consistently argued that the Contract terminated on March 22, 2020, based on the notice that was sent February 21, 2020.  The Contract termination clause required a reasonable opportunity to cure during that intervening month.

When the UG first began to impose substantial Section 7.02(b) penalties, Deffenbaugh filed one appeal, which it withdrew after receiving documentation from the government.  The UG then continued to impose substantial penalties, deducting these from Deffenbaugh's invoices, for over half a year.  During this time, month after

---

[66] Dkt.  92, at 43-44.

month, Deffenbaugh remained silent and voiced no serious objections or raised specific challenges to the penalties.

When Deffenbaugh finally sent its termination letter notice in February 2020, it couched its complaint in only the most general terms, complaining that the UG had imposed excessive penalties.  Given that in the intervening months the total amount of penalties grown to over a half million dollars, representing charges for thousands of missed pickups, and further given that Deffenbaugh itself has acknowledged its service was substandard, such a conclusory notice was not reasonably calculated to allow for a cure.

## C.      Prior Material Breach

The UG argues that Deffenbaugh cannot recover under Count 1 or Count 3, because it breached the Contract first by its poor performance.  Defendant's argument is grounded on the "first-to-breach" doctrine, alternatively known as the prior material breach rule.  Specifically, the UG alleged that, before it began imposing Section 7.02(b) penalties, Deffenbaugh had already breached various portions of the Contract by (1) failing to fully collect all trash, (2) the failure to use enough trucks and drivers to collect the trash, (3) failing to provide service of "the highest possible quality," (4) failing to timely resolve customer complaints, (5) failing to maintain complaint records, and (6) performing particularly poorly in May 2019.

"A party is not liable for a material failure of performance if it can show that the other party committed a prior material breach of the contract; in such event, the prior breach discharged the first party's own duty to perform."[67] "The first-to-breach rule precludes a party who has first materially breached a contract from attempting to enforce that contract until the breach is cured and entitles the nonbreaching party to suspend or terminate performance under that contract as long as the breach remains uncured."[68]

Defendant's argument fails for two reasons. First, the first-to-breach rule only excuses performance where the breach in question was material.

> The rescission of a contract or the discharge of obligations does not arise from every prior breach… [S]uch breaches [must be] material and so substantial as to defeat the main purpose of those contracts …, such that the breaches might excuse all performance by plaintiffs under those contracts.[69]

A breach is material if as result "if the promisee receives something substantially less or different from that for which he bargained."[70] Kansas courts have found persuasive the

---

[67] *Fusion, Inc. v. Nebraska Aluminum Castings, Inc.*, 1997 WL 51227, at *15 (D. Kan. 1997) (applying Kansas law) (citations omitted).

[68] *Bank of Am., N.A. v. Narula*, 46 Kan.App.2d 142, 261 P.3d 898, Syll. ¶ 4 (2011).

[69] *Turney v. Dz Bank AG Deutsche Zentral Genossenschaftsbank*, 2010 WL 3735757, *6-7 (D. Kan. 2010).

[70] *Almena State Bank v. Enfield*, 24 Kan.App.2d 834, 954 P.2d 724, 727 (1998) (alteration and internal quotation omitted). "[T]he right to rescind a contract is extreme," and arises only where "the failure to perform so substantial as to defeat the object of the parties in making the agreement. A breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of a contract, does not warrant a rescission. *In re Johnson's Estate*, 202 Kan. 684, 691-92, 452 P.2d 286 (1969).

analysis of the Restatement of Contracts,[71] which lists the factors that are significant in

determining whether a breach is material, as follows:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standard of good faith and fair dealing.

In its Memorandum, Defendant details the various alleged failures of

Deffenbaugh, but advances no materiality analysis at all.[72] This is fatal because whether

a breach was material in nature "is a question of fact to be determined from the

circumstances of each case."[73] Even assuming that various failures by Deffenbaugh in

fact occurred, with the result that there were frequent missed pickups, this must be

balanced against the scale of the Contract, with Deffenbaugh performing over 5 million

---

[71] RESTATEMENT (SECOND) OF CONTRACTS § 241 (1979).  *See Coonrod & Assoc. Constr. v. Davis*, 2006 WL 3773235, *7 (Kan.App. 2006) (applying Section 241);  *Fusion*, 1997 WL 51227 at *16 (same).

[72] Dkt.  98, at 28-33.

[73] *Almena State Bank*, 954 P.2d at 727 (citations and quotations omitted).

collections in Wyandotte County each year.  Further, there is evidence of a nationwide shortage of trucks and drivers, meaning the UG may not have been able to obtain better performance by any other contractor.  There is also evidence showing that the vast majority of "missed pickups" are in fact due to residents placing the trash curbside after 7:00 a.m.  And finally, the Contract itself recognizes that missed pickups would sometimes occur, and provides a vehicle (Section 7.02), for such remediating such events and, if necessary, reducing payments to Deffenbaugh for its failures.  Given this evidence, and Defendant's failure to offer anything in the way of an assessment of materiality, the Court cannot conclude, beyond a reasonable doubt, that the cited breaches deprived the UG of the main purpose of the Contract.

Second, and more fundamentally, the first-to-breach doctrine excuses future performance by non-breaching party—unless that party signals that it wishes the exchange of obligations to continue.  Under the prior material breach rule, if Deffenbaugh committed a prior material breach of the Contract, this "discharge[s] the [UG]'s own duty to perform."[74] But it does not authorize the UG to simultaneously act as if the Contract remained in force for months or years afterward.  When a prior material breach exists, "the other party [i]s released from performing its obligations;"

---

[74] *Fusion*, 1997 WL 51227 at *15.

but "a party's performance is not excused … if the non-breaching party treats the contract as continuing."[75]

Thus, "when an aggrieved party knows about the other party's breach but still acts as if the contract is valid, the aggrieved party later cannot claim that the breach discharges it from the contract's obligations."[76] As one leading commentator explains:

> When there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform.  In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform *does not apply when the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.*
> …
> If the obligor, nevertheless, knowingly and voluntarily accepts the defective performance, fairness dictates that it should thereafter render any agreed return performance.  Although the obligor may still be entitled to damages for the defective performance, it cannot escape the duty to perform for, *by outward manifestations indicating that the defective performance has been accepted, the obligor has sent the unmistakable signal – by conduct, rather than by an express promise – that it still considers the contract to be binding.*[77]

---

[75] *AME & FE Invs., Ltd.  v. NEC Networks*, LLC, 2019 WL 286121, at *10 (Tex.  App.  Jan.  23, 2019)

[76] *Accountable Health Solutions v. Wellness Corp. Solutions*, 333 F.Supp.3d 1133, 1151 (D. Kan. 2018).  *Accountable Health* applied Delaware law, but as Judge Lungstrum observed in *Turney*, 201 WL 3735757, at *6 n.  7, the law regarding the prior material breach doctrine "is generally universal among the states, and thus the result would be the same regardless of whether another state's law should apply."

[77] 14 WILLISTON ON CONTRACTS § 43:15 (4th ed.) (emphasis added).  A similar view is expressed in the RESTATEMENT (SECOND) OF CONTRACTS § 246 (1981) ("an obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-

The UG argues in reply that it is not arguing that it is relieved from *all* of tis contractual obligations indefinitely.[78] But the UG supplies no authority for its argument that it can essentially pick and chose which parts of the Contract it wishes to comply with and which it can dispense with.  For months and indeed years after the alleged breaches, the UG has consistently acted as if the Contract remained in force and effect.  Indeed, as noted elsewhere in this Order, the UG actively opposes Deffenbaugh's efforts to declare that the Contract has been validly terminated.  Under the circumstances of the case, the Court determines that the doctrine of prior material breach is not in a defense to Deffenbaugh's claims.

### D.       Withholdings and Default

Under Section 5(a)(3) of the Pretrial Order, Deffenbaugh includes in the "Relief requested by Plaintiff" the return of the total amount to all Section 7.02(b) penalties:

> Deffenbaugh seeks damages in the amount of $574,300, which represents the *total amount* of *unenforceable penalties* the UG improperly imposed upon Deffenbaugh from May 2019 through February 2020 and withheld from payment of Deffenbaugh's invoices.

---

occurrence").  *See Amoco Prod. Co. v. Hugoton Energy Corp.*, 11 F.Supp.2d 1270, 1279 (D. Kan. 1998) (citing RESTATEMENT § 246 and quoting *Brinkman v. Empire Gas & Fuel Co.*, 120 Kan. 602, 245 P.  107 (1926) ("If the promisee waives, nobody else can complain.  If the promisee does not waive, he must complain promptly.")).

[78] Dkt.  107, at 17.

In its summary judgment motion, Deffenbaugh seeks a determination that it is entitled to a repayment of this $574,300 total.[79] However, the only argument Plaintiff offers in support of this result is its contention that Section 7.02(b) is an unenforceable penalty.  Because this provision is enforceable, the Court denies the motion for return of the total amount of damages.

Beyond this claim for damages, both parties in conjunction with their declaratory judgment claims argue that the Court should determine that certain penalties were, or were not, proper under the Contract.  Deffenbaugh argues that the UG did not observe "each and every term" of the Contract, and defaulted by imposing improperly calculated and unjustified penalties.  In particular, it contends the UG should not have imposed penalties (1) which were not based on Customer Complaints, (2) which reflect repeated missed pickups even though only one Complaint was made, (3) reflect charges the same day as the Complaint, without allowing for the 24-hour remediation period, (4) are grounded on documentation showing that the trash had not been placed "curbside," and thus was not collectible, (5) are for addresses other than the Customer making the complaint, (6) where the photographs fail to show there was in fact not a pickup, (7) where the UG's documentation does not include photographs, (8) if the complaint was received the day before the scheduled pickup day, or (9) were  imposed before the first Customer Complaint.

---

[79] Dkt.  100, at 46.

The UG argues it is entitled to summary judgment on the issue of the penalties imposed, except for potential "errors in the calculations themselves," which the UG alleges are not material and present issues which are "factually intensive."[80] The UG contends the Court find that under Section 7.02(b) it could impose penalties based on missed pickups reported by its staff, or based on conclusions that Deffenbaugh failed to pick up the trash from other residences on the same street or the same neighborhood, and that the Contract placed the burden of investigation, and remediation entirely on Deffenbaugh.  Since Deffenbaugh failed to "red tag" any trash which was supposedly noncompliant, the UG argues, it cannot now assert a resulting penalty was improper.

The parties advance their arguments based on their autopsy of thousands of Section 7.02(b) penalties.  As indicated more fully in the Factual Background set forth above, in many instances the claims of the parties are not capable of resolution on summary judgement.  For example, Deffenbaugh argues that penalties were imposed even though the documentation photos show that Customer had not placed the trash actually at curb, or the photos show only the container – meaning that the trash might have been picked up but the empty container left at the curb.

As to Plaintiff's summary judgment claims, the Court must grant all reasonable inferences to the UG.  A rational factfinder could agree with Tobin, the UG's Deputy Director of Public Works, that Deffenbaugh's was "horrendous," and with the private

---

[80] Dkt. 98, at 35.

emails sent by Deffenbaugh staff essentially confirming the poor quality of the company's performance.  A rational factfinder could conclude that UG staff took the photos precisely to document Deffenbaugh's poor performance, and were not required to visually inspect each container to photograph the trash inside the container. Therefore, Plaintiff is not entitled to summary judgment on these issues.

Similarly, summary judgment is not justified as to Deffenbaugh's claim that penalties could not be imposed where the UG did not photographically document Plaintiff's poor performance.  Section 7.02(b) contains no requirement for such photographic documentation.  Deffenbaugh argues that the UG, once it adopted as system for documenting failed pickups, is bound by the system, and cannot seek penalties in the absence of such documentation.  But this is again reading into Section 7.02(b) a burden which is not there, and it also ignores the express Contract provision stating that its terms could not be altered except by the written agreement of the parties.

Material issues of fact also remain as to whether penalties were properly imposed even though, according to Deffenbaugh, the photographs show that the trash was not actually at the curb.  As indicated above, the photographs in question are generally ambiguous, and either show the trash in the vicinity of the curb or at least not so clearly removed from it that the Court can say beyond a reasonable doubt that the trash was not collectible under the Contract. Accordingly and except as otherwise discussed below, at least some of Deffenbaugh's claims of improper penalties must be resolved by the trier of fact.

However, aside from these specific factual issues, the Court can resolve certain questions of interpretation which divide the parties.  Most importantly, can a penalty be imposed in the absence of a "Customer" Complaint?  The Court concludes that it cannot; penalties under Section 7.02(b) may only be imposed where there is a specific resident complaint as to a missed pickup of that resident's trash.  This follows from the specific language of Section 7.02, as well as the general language,  context, and purpose of the Contract.

The UG correctly notes that Section 7.02(b) itself provides for penalties for unremedied complaints, without specifying that only a complaint by a customer or resident can trigger the penalty.  But this reading requires focusing on subsection (b) in isolation, and ignoring the language of the preceding and succeeding subsections with the Contract's provision for the resolution of "Complaints."[81]

The Contract provides for a penalty for any "complaint involv[ing] a failure … to make a scheduled collection," which is not remedied by Deffenbaugh within 24 hours. But the preceding subsection (a) expressly defines the responsibility of Deffenbaugh to only as to Customer complaints:

> The Contractor shall be responsible for receiving *Customer's inquiries, requests for service and complaints* related to service under this Contract. The Contractor shall provide the UG with a telephone number which will be published in informational literature and in the Government section of the local telephone kook.  Any calls received by the UG concerning the services provided under this Contract shall be referred to this number.

---

[81] Section 7.02 appears in full at page four of this Order.

> The Contractor's telecommunications system must be capable of handling *Customer calls* during peak periods of activity.

(Emphasis added.)

That "complaints" generated by UG staff do not fall within the penalty clause may also be seen in the duties imposed by all three subsections.  Under subsection (a), "complaints" are received by means of a telephone number which Deffenbaugh must "publish[] in informational literature and in … the local telephone book."  Under subsection (b), Deffenbaugh must carefully record "the telephone number of the complaint."  And under subsection (c), it must then "forward to the Contracting Officer [a UG officer] a description of such complaint."  All of these obligations are superfluous if the UG itself can be the source of a complaint.  The UG and Deffenbaugh would already have the necessary contact information in the first two instances, and the UG (being the source of the complaint) would already know the allegations involved.

The interpretation is also supported by the remainder of the agreement.  Under the Contract, a "Customer" is expressly defined as "[a]n occupant of a Residential Unit who generates Waste."[82] And the term "Waste" is similarly defined in a site-specific fashion, meaning "[a]ll garbage, rubbish, trash, refuse or waste generated at a Residential Unit or at a UG Facility."[83] Collectively, this language suggests that the

---

[82] Section 1.11. A "Residential Unit" is a "dwelling within the geographical boundaries of the City of Kansas City Kansas forming a single inhabitable unit with facilities used or intended to be used for living, sleeping, cooking and eating."

[83] Section 1.15.

parties intended that, for penalty purposes, "complaints" are limited to residential customer complaints.

Finally, this interpretation is corroborated by the nature and circumstances of the agreement. The UG's employee Ken Mack testified that in the vast majority of complaints that are made, the trash was placed at the curb after the collection truck passed. The interpretation advanced here helps to limit the number of false complaints, as only the individual resident is in a good position to say with personal knowledge when her or she placed the trash at the curb. Finally, this interpretation limits the temptation to wield Section 7.02(b) in a genuinely punitive manner or otherwise serve as a unilateral price adjustment. As noted earlier, the Court finds that the $200 stipulated damages amount is not unconscionable or unreasonable under the circumstances of the case and in light of the construction offered here—that only specific Customer complaints can trigger the penalty.

Accordingly, penalties were appropriate where a Customer complained for his or her specific residence that a prior scheduled pickup was missed, and this complaint was not remediated within the time allowed by the Contract. Reports by UG staff or third persons of missed pickups would not form a proper basis for a penalty under Section 7.02(b). Similarly, charges assessed on a neighborhood-wide basis also fall outside the scope of the penalty clause, as do charges which were imposed which did not allow for a timely cure by Deffenbaugh.

It may be that in many instances, Deffenbaugh was indeed responsible for poor collection service, missing entire neighborhoods. But the Court must enforce Section 7.02(b) as written. If the UG wanted a stipulated damages provision with far broader reach, it was free to negotiate for such provision.

### E.      The 311 Claim

As noted earlier, as a part of its factual contentions in the Pretrial Order, Deffenbaugh alleges that the parties "agreed that the telephone number for Deffenbaugh to receive Customer's inquiries, requests for service and complaints related to service under the Contract would be the '311' phone number that is operated by UG, and that the telephone number previously provided by Deffenbaugh would no longer be used for Deffenbaugh to receive Customer's inquiries, requests for service and complaints," but that the UG imposed a "substantial number of the penalties" based on complaints "that were not received through the agreed '311' phone number."[84]

In contrast, the UG alleges in the Pretrial Order that it "allowed Waste Management to directly access and utilize the UG's 311 call system as a method (but not the sole method) of receiving customer complaints."[85] The UG argues that it did not breach the Contract because (1) regardless of any understanding regarding the 311 number, the Contract itself was never amended; (2) Deffenbaugh also failed to follow

---

[84] Dkt. 92, at 24, 28.

[85] *Id.* at 32.

any such agreement and indeed Deffenbaugh never trained its own personnel to refer all complaints to the 311 number, and (3) its only obligation under the agreement was to educate the public to use the 311 number to make complaints.

Contrary to the UG's contention that Deffenbaugh has failed to allege that UG breached its obligation to refer calls to the agreed 311 number, Deffenbaugh does allege in the Pretrial Order that it properly terminated the Contract based on the UG's defaults, and that one of those defaults was the failure to abide by the "sole method" agreement.[86]

The Court also finds that such an agreement is not precluded by Section 12.07, which provides that that the Contract "may not be modified, amended or supplemented except in writing signed by or on behalf of both parties by their duly authorized officers."  Section 7.02(a) does not independently set forth any specific telephone number for customer complaints.  If it did, Section 12.07 might indeed require a written amendment to make any change effective.

To the contrary, Section 7.02(a) simply requires Deffenbaugh to designate "a telephone number" for receiving complaints.  In essence, the Contract simply invites the parties to cooperate for purposes of registering Customer complaints. It appears that the parties' course of conduct may have indicated that the 311 number was the number designated for receiving complaints.  Such a designation would have been consistent

---

[86] Pretrial Order, at 39.

68

with the contract.  Deffenbaugh must have a communication system capable of handling complaints, and must publish the number.  The number would also be "published … in the Government section of the local telephone book," a requirement suggesting agreement by the UG. Assuming the parties in fact agreed to a change of the telephone number, this would not alter the terms of the Contract.

There remains an issue of fact remains as to whether customer complaints received outside the 311 number would violate the Contract. There is evidence which a rational fact-finder could infer the UG agreed to exclusively use the 311 number. First, the UG stated in a response to interrogatories that the Contract "directs the UG to refer calls to the agreed upon number (now the UG's 311 number by understanding and agreement of the parties)."  Second, UG public works employee Kirk Suther wrote in an email that "[i]t is vital for Deffenbaugh to have access to complaints instantly through our 311-system as that starts a 24-hour time period to resolve each complaint."  Further, Section 7.02(a) speaks expressly of designating "a telephone number" for complaints, with the stipulation that "[a]ny calls received by the UG" would be forwarded to "this number."  For purposes of how complaints are registered, the Contract favors exclusivity and clarity.

On the other hand, there is some evidence which might support a conclusion that the parties did not intend for the 311 number to be the only means of registering complaints for purposes of imposing Section 7.02 penalties. The existence and extent of

69

any agreement relating to the 311 number, and the extent it may have been shaped by the parties' course of dealing, are unresolved issues of fact.

Accordingly, whether the UG's imposition of penalties based on complaints made outside the 311 system was a default under the Contract remains an issue for trial, and the Court denies Defendant's motion for summary judgment to the extent it seeks a contrary determination.

### F.      The House Count

As a part of the formula for calculating compensation under the Contract, Section 2.07(a) provides that each year the parties would "determine the number of Residential Units being collected."   In 2018, the UG validated 53,839 Residential Units. Deffenbaugh alleges in the Pretrial Order that the UG subsequently failed to properly determine "the actual number of Residential Units."[87]   Deffenbaugh also cited as a default that the UG "failed to adjust the number of residential units and/or compensate Deffenbaugh for the number of residential units served."   The UG argues that it followed the methodology set forth in Section 2.07(d) for calculating the number of Residential Units collected, and that when Deffenbaugh complained this did not result in an actual counting, it proposed a contract amendment, and that when Deffenbaugh refused, it "agreed to pay a higher amount, which amount was agreed upon by and

---

[87] Pretrial Order (Dkt. 92), at 28.

accepted by Waste Management.  Waste Management accepted monthly payments on the compromise amount without objection until filing this lawsuit."[88]

Deffenbaugh's argument that the UG was required to perform an "actual" house count is inconsistent with the letter and spirit of the Contract.  Inconsistent with the letter, because the term "actual" residence does not appear in Section 2.07, and inconsistent with the spirit, as the Section 2.07 is clearly designed to avoid forcing the UG to engage in an annual review of tens of thousands of residences.  To the contrary, Contract provides that the starting "house count" was a figure negotiated by the parties, and that under Section 2.07(d), this figure would be adjusted for only specific and limited reasons.  Under Section 2.07(d) methodology:

> The number [of initial Residential Units] in effect on the date of execution of this Contract has been derived from a series of prior agreements, house counts, surveys and utilization of the database of the Board of Public Utilities of Kansas City, Kansas identifying the number of electrical service accounts. The parties shall determine the number of residential units being served by adding to the existing number of units, the new accounts added to the BPU data base and then subtracting from that number the total units demolished since the last determination, the number of uninhabitable units and those exempted.  Exempted units shall mean non-residential barns, sheds and garages that have a separate electrical service.

That the "house count" for purposes of the Contract is not the same as some "actual" number of residences is also reflected  in Section 2.07(a), which expressly provides that a change of less than one percent of Residential Units as calculated by Subsection (d) (that is, some 500 houses) would not require an annual adjustment.  The Contract

---

[88] Pretrial Order, at 42-43.

creates a specific mechanism for easily and objectively determining the "house count" without requiring the UG to engage in annually auditing the occupancy of over 50,000 houses in Wyandotte County.

The UG also argues that the supposed agreement to set a different house count in 2019 arose only because Deffenbaugh threatened to cut off service to all of the UG's customers. It also notes that John Blessing of Deffenbaugh discussed the house count dispute in a February 2019 email, stating that "unfortunately, the current contract language does not support our position on house count adjustments and billing." Blessing's opinion is consistent with the Court's assessment.

Deffenbaugh responds by claiming that such a conclusion would be "illogical," offering a hypothetical involving a duplex apartment which "may have one BPU account but be two Residential Units."[89] Deffenbaugh offers no evidence on the number of such duplex apartments, but the problem is not the sheer speculation involved. The Contract expressly provides for adjustment on the basis of BPU figures only. Prior to the present litigation, if Blessing is to be believed, Deffenbaugh privately agreed with this construction. To the extent Deffenbaugh now wishes for a different formula, its remedy was to seek a written modification of the Contract pursuant to Section 12.07, not claiming a default where none existed.

---

[89] Dkt. 104, at 49.

E.      **Counterclaims**

The UG has counterclaimed against Deffenbaugh alleging that the collector breached the Contract in various ways, including failing to provide sufficient vehicles and equipment (as required by Sections 3.01 and 3.07), and failing to make timely collections as required by Section 4.03.[90] In seeking summary judgment as to these counterclaims, Deffenbaugh does not argue that it did not breach the Contract in the manner alleged.  It argues that the UG cannot recover four types of damage now sought.  These include damages for the time both before and after the period the UG imposed actual penalties and deducted corresponding amounts from Deffenbaugh's invoices — that is, (1) the period from January 2018 to April 2019, and the (2) the period from April 2020 to the anticipated trial.  In addition, Deffenbaugh argues that the UG cannot recover counterclaim damages (3) based on a large scale failure of service in June 2017, and cannot recover (4) the costs of monitoring and investigating Contract compliance.

Only the first and last of these arguments require substantial scrutiny, as Deffenbaugh's only grounds for denying damages for the period from April 2020 to the present is that Section 7.02(b) is unenforceable and that the Contract was validly terminated in March 2020.  And the only ground offered by Plaintiff for denying damages for the June 2017 incident is the alleged unenforceability.  As noted above, the

_____

[90] Pretrial Order (Dkt.  92), at 52-53.

Court finds Section 7.02(b) is not unenforceable, and that the Contract was not effectively terminated in March 2020. Accordingly, the Court denies summary judgment as to these counterclaims.[91]

Deffenbaugh does offer an additional argument against the damages for the period from January 2018 to April 2019; it contends these claimed damages are speculative and unsupported by actual evidence. In calculating damages for each month during this period, the UG used the average monthly penalty[92] later assessed from June of 2019 to June of 2020. The damage calculation does not use any actual data for the earlier period, nor does it identify particular residences with missed pickups.

In support of this approach, equating the earlier period with the later period in which penalties were actually imposed, the UG relies on the testimony of its Deputy Director of Public Works, Michael Tobin, who was asked by Defendant's counsel if "the performance of [Deffenbaugh] in terms of missed collections" during the two periods was "consistent." Tobin responded: "There were a lot of misses. I mean it was not good performance." Counsel asked again, "Were those two time periods consistent?," and Tobin responded, "I would say yes."

---

[91] In its Reply (Dkt. 108, at 27), Deffenbaugh disputes the UG's argument that it agreed to pay the June 2017 penalty, contending as a factual matter it only agreed to contribute funds to a public improvement projected, not to pay the penalty. The court need not resolve the factual dispute, however, because as noted above the only ground for dismissal of the counterclaim in Plaintiff's original memorandum was the alleged unenforceability of Section 7.02(b).

[92] The UG's average penalty calculation excludes the two months in which the most and least penalties were imposed.

The Court will grant summary judgment in favor of Deffenbaugh on the issue, finding the damage calculation based on unfounded speculation.  The UG's calculation applies the sharp $200 penalty imposed by Section 7.02(b) to a period in which no Section 7.02(b) procedures were used and no documentation exists.   The UG acknowledges, in arguing in favor of the enforceability of Section 7.02(b), that the clause is necessary because determining actual damages for missed trash collections "is difficult, if not impossible, to calculate in dollars and cents."[93] The $200 penalty in Section 7.02(b) avoids this difficulty, but has its own price tag:  it only applies for where Deffenbaugh has failed to timely remediate a customer's valid complaint of a missed pickup.  Moreover, even where the $200 penalty might otherwise be applicable, Section 7.02(b) only provides that the amount may be "deducted from the UG's next payment to the Contractor"—it does not provide that that amount may also be recoverable as liquidated damages in a separate action, brought years after the event, for breach.  The limitation of the $200 remedy to a setoff in the "next payment" also effectively gives Deffenbaugh a right to submit a timely appeal of the penalty.

 Tobin's conclusory statement that Deffenbaugh's performance was roughly similar does not trigger the carefully constructed mechanism of Section 7.02(b).  The UG has no evidence of any specific complaints or remediation failures for the earlier time

---

[93] Dkt.  103, at 50.

period, and seeks to impose Section 7.02(b)'s penalties in a manner beyond the language of the agreement.

The Court will also grant summary judgment in favor of Deffenbaugh as to the UG's counterclaim for Contract monitoring and remediation. The UG seeks recovery for what it describes as the time its staff was devoted to "monitoring missed collections, assuring proper notice of missed collections, fielding customer complaints, referring customer complaints, monitoring Deffenbaugh's response to missed collections, and making collections when Deffenbaugh's [sic] failed to do so."[94] The UG also seeks recovery for the expense incurred in employing its consultant Burns and McDonnell to evaluate Deffenbaugh's performance. In his Rule 30(b)(6) testimony, the UG's corporate representative Mike Tobin acknowledged that the UG was seeking compensation for "all the time that Solid Waste [UG employees] had worked on the Waste Management issues," meaning "determining whether the trash is being picked up."

Defendant's counterclaim suffers from two flaws. First, the costs of investigating contract claims are generally not recoverable.[95] Second, the UG has separately assessed liquidated damages based on the same underlying conduct. Liquidated damages are "recoverable in lieu of actual damages," and "an election between the two is ordinarily

---

[94] Dkt. 103, at 49.

[95] *See Home Owners Ins. Co. v. Griffith*, No. 312707, 2014 WL 5462597, at *6 (Mich. Ct. App., Oct. 28, 2014).

required."[96] The UG has presented no reason why it should recover both liquidated damages and actual damages for the same events.

In summary, the Court finds that the Contract was not terminated in March 2020, and that Section 7.02(b) is not unenforceable. However, under Section 7.02(b) the UG could properly impose the $200 stipulated damage only when: (1) Deffenbaugh failed to make a scheduled pickup for a particular residence,[97] (2) a Customer complained his or her trash had not been picked up, and (3) Deffenbaugh failed to pick up the trash within 24 hours after the complaint. If these three conditions were met, the UG could then begin imposing the stipulated charge.

The UG did not adhere to "each and every" provision of the Contract when it imposed substantial penalties based solely upon the reports of its own staff, or for addresses where there was no missed pickup complaint by a Customer residing there.

The Plaintiff is not entitled under Count 3 to a return of all penalties imposed. The doctrine of prior material breach is not a defense to Plaintiff's claims under Count 1 or Count 3.

---

[96] *Rice's Lucky Clover Honey v. Hawley*, 700 F. App'x 852, 865 (10th Cir. 2017) (citing 11 Joseph M. Perillo, CORBIN ON CONTRACTS: DAMAGES § 58.9, at 446 (2005)). *See also Ely v. Wickham*, 158 F.2d 233, 235 (10th Cir. 1946) ("the injured party may not disregard the provision as to liquidated damages and seek a recovery measured by the actual damage suffered"); *Edward Kraemer & Sons v. The City of Kansas City, Kansas*, 1995 U.S. Dist LEXIS 9523 (D Kan. 1995).

[97] Section 7.02(b) provides for penalties for failure to make "a scheduled collection." Other provisions of the Contract (such as Article V) define Deffenbaugh's collection responsibilities. Under Section 7.02(b), penalties may be imposed where Deffenbaugh fails to "resolve[]" a complaint involving a "failure" to collect trash. Deffenbaugh cannot resolve complaints which involve uncollectible trash. However, as noted above, factual issues remain as whether particular complaints were meritorious.

The Court finds that the dispute as to the "house count" was not a default by the UG under the Contract.

Whether the UG defaulted under the Contract by violating a "311 Agreement" is a question for the trier of fact.

The Court grants summary judgment in favor of Deffenbaugh as to the UG's counterclaims for damages for the period from June 2018 to April 2019, and for the cost of monitoring and investigating Contract compliance.  The Court denies Deffenbaugh's motion for summary judgment as to the remaining counterclaims.

**IT IS THEREFORE ORDERED** that the Motions for Summary Judgment of Plaintiff and Defendant (Dkt. 98, 99) are granted in part and denied in part as provided herein.

**IT IS SO ORDERED.**

Dated this 23rd day of December, 2021.


ERIC F. MELGREN
UNITED STATES CHIEF DISTRICT JUDGE